[Crim. No. 3837. Fourth Dist., Div. Two. Aug. 10, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT I. HELMHOLTZ, Defendant and Appellant.

## COUNSEL

Herbert M. Porter for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Howard J. Schwab, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**GARDNER, P. J.**—Defendant was indicted for selling LSD and for selling amphetamine, both in violation of section 11912 of the Health and Safety Code. He was found guilty after a court trial and this appeal is from the judgment of conviction.

Defendant contends: (1) that he was denied a fair trial by the prosecution circumventing his obtaining as a witness, Nicky Colangelo, an in-

former, who was a material percipient witness; and (2) the prosecution failed to comply with a mandate of *Eleazer* v. *Superior Court,* 1 Cal.3d 847 [83 Cal.Rptr. 586, 464 P.2d 42], in regard to the same witness.

A lengthy statement of the facts is unnecessary on the issues raised. Suffice to say that a state narcotic agent, Kenneth Curtis, purchased one capsule of LSD and a "dime bag" of methedrine from defendant. Nicky Colangelo, an informer, working with Mr. Curtis, actually purchased the LSD in Curtis' presence with funds supplied by Curtis. Colangelo also was present when Curtis purchased the methedrine. Curtis paid defendant $5 and $4 of city funds, respectively, for the drugs. It was stipulated that the drugs purchased contained useable amounts of LSD and amphetamine.

The defendant took the stand on his own behalf. He denied having sold Curtis or Colangelo any LSD or methedrine.

Nicky Colangelo, the informer, who actually purchased the LSD did not testify and could not be located by either the defense or the prosecution.

Although the sale of drugs by the defendant in the instant case is completely unrelated to that in the case of *People* v. *Yeager, post,* 10 Cal.App. 3d 451 [88 Cal.Rptr. 749] decided this same date, the two cases involve the same issues and the same informer.

The record is confused by the fact that the grand jury apparently indicted a number of people using the same witness, Curtis, and involving the same informer, Colangelo. While all of these people were indicted and tried separately, the attorney representing this defendant also represented five other defendants, including Mr. Yeager. For convenience of counsel, all six of his cases were handled as a package during the preliminary proceedings. The record is further obscured by the fact that defense counsel, while garrulous and persistent, formulated his demands in a very imprecise manner, and as a result the very patient trial judge was not in a position to make clear cut rulings on the demands. This combination does not make for a good record. Nevertheless, as we must, we have gone through the record carefully and feel that the following is a fair summary of the facts bearing on the efforts of the defense to ascertain the whereabouts of the informer, Colangelo.

The grand jury presented an indictment against the defendant on July 30, 1968. The next day, July 31, he was arraigned, the public defender appointed to represent him, and the matter was continued until August 7, 1968.

On August 7, 1968, the public defender was relieved and private counsel appeared on his behalf. At that hearing, defense counsel said in reference to

the two witnesses, Curtis and Colangelo, "We are demanding their presence." Just what that expression meant is not at all clear since the matter had not been set for trial nor was there anything in the offing in which they could have appeared. The district attorney apparently felt equally baffled because he asked, "What about these two witnesses, Colangelo and Curtis?" Unhappily, he did not receive an answer to his query. Thereupon after some more general conversation, the matter was continued until August 9 for a motion for reduction of bail and then to August 15 for plea. No plea was entered and the matter was continued to September 6 for plea. On September 6, a motion to set aside the indictment was continued until September 13. On September 13, the motion to dismiss the indictment was denied and the matter was continued until October 18 for a hearing under section 1538, Penal Code. At the hearing on September 13, defense counsel said, "We would advise the prosecution that we wish at the 1538.5 motion the presence of the witnesses Curtis and Colangelo. In regard to the witness Colangelo, we have had some possible misunderstanding. If the court will remember, when we were first before the court in respect to this series of cases, I asked the court at that time to order the presence at all trial proceedings of the witnesses Curtis and Nick Colangelo. I have heard actually directly from the witness Colangelo that he does not intend to be in court.

"If the court will remember, the Court made an order to the District Attorney on that first appearance we made in this case that the District Attorney see that those two witnesses be present." The court denied having made such an order but suggested that if anyone wanted this witness he might be subpoenaed. Defense counsel indicated some reluctuance to subpoena the witness because of his "trial strategy" but finally decided he would subpoena the witness. The matter was then continued to October 18 when it was again continued until November 8. At the hearing on November 8, defense counsel indicated that he had sent the local sheriff a subpoena to be served on Curtis and Colangelo but that he had not provided the sheriff's office with an address, assuming that they were well known to the sheriff. The court observed rather acidly that the civil division probably had no idea what was happening in the criminal division. Defense counsel again insisted that it was the court's order that these witnesses be available whereupon the court made an order rescinding such an order it might have made. (In fact, the record does not indicate that the court had made such an order.) At this point, the case was continued to November 22. At the hearing of November 22, after extensive and rambling dialogue between the court and counsel in regard to these witnesses, the district attorney advised that the police department had not given the defense Colangelo's address because he was in danger. Again, there was no motion or ruling and the case was continued until December 20. On December 20, the

matter went off calendar since counsel for the defendant was not present because of illness. The matter was continued to December 27 and on December 27 the matter was again continued, this time to January 24, 1969.

On January 24, defense counsel for the first time made a motion requiring the district attorney to provide the address of the witness Colangelo. The district attorney stated, "As far as the address of Nicky Colangelo, your Honor, I do not know whether we are legally compelled to go to this extent or not, but I have taken the liberty of contacting the Detective Bureau of the Riverside Police Department. They have informed me the last known address they have on Nicky Colangelo is 6019 Mountain View here in the City of Riverside." He further continued, "I have inquired from the police officers, the sheriff's department as to whether they have the current address of Nicky Colangelo, and each time my response from the officers, and directed to Mr. Porter, is we do not know where he is. We cannot ourselves serve him. That is the status of Nicky Colangelo as of this moment, your Honor." Defense counsel advised that Colangelo had been seen by witnesses and had been recently incarcerated in the Riverside jail. The case was again continued this time to January 30 when the case was continued until January 31. On January 31, defense counsel stated, "They gave us an address the last time we were here which we were informed by a relative of Colangelo was given to us after Colangelo had decamped for several weeks—evidently left the Riverside area immediately after he was released, or shortly after he was released by the Sheriff's Department on December 10 of 1968, . . . ." He further advised that Colangelo was evidently in the Northwest or in Canada as some relative had so advised the defendant and that Colangelo had made a statement through his wife that he would never be brought to court. The district attorney in response merely advised again that he had given all the addresses that he had and that he did not know of anything else to do.

The matter was then continued to February 14 when a motion to dismiss on the grounds of unavailability of Colangelo was made and denied.

The case finally went to trial on May 26, 1969—some nine months after plea.

## I.

Answering defendant's first contention, we hold that under the above statement of facts the defendant was not denied a fair trial by the prosecution's circumventing his obtaining Colangelo as a witness. There is no evidence to support a finding that the prosecution continued to deny the defense access to this witness. It is clear from the record of the trial that Colangelo and the defendant were old friends and it is obvious from

the record that the defendant's sources of information were better than those of the prosecution. The prosecution did not circumvent the defendant's obtaining Colangelo as a witness. They gave the defense all the information they had.

## II.

As of the date of the trial, the rule in California was that the prosecution's only duty was to disclose the name and address of the informer and there was no duty on the part of the prosecution to locate and/or produce him. Of course, the prosecution could not conceal or secrete him. (*People* v. *Kiihoa,* 53 Cal.2d 748, 752 [3 Cal.Rptr. 1, 349 P.2d 673]; *People* v. *Tuthill,* 31 Cal.2d 92, 98 [187 P.2d 16]; *People* v. *Lara,* 253 Cal.App.2d 600, 604-605 [61 Cal.Rptr. 303].)

The prosecution complied in good faith with the law as it existed at that time. In response to defendant's demand for the address of the informer, the prosecution gave the defense all they had. (There was never an issue as to the informer's identity—he was well-known to the defendant and had been for several years.)

However, in the case of *Eleazer* v. *Superior Court, supra,* 1 Cal.3d 847, decided January 30, 1970, the California Supreme Court extended the duty of the prosecution regarding the identity and location of the informer who is a material witness.

*Eleazer* held that when an informer becomes a material witness[1] the prosecution must demonstrate that it has attempted in good faith to locate him; that the duty to disclose the identity of the informer cannot be evaded by deliberate failure to acquire information necessary to find him. *Eleazer* came up on a writ of prohibition and, since prior decisions had not expressly imposed on the prosecution the duty of a good faith attempt to locate the informer or clearly delineated the scope of the duty in this regard, the court concluded that the case should not be dismissed without affording the People an opportunity to comply with the new rule. Therefore, the alternative writ of prohibition was discharged without prejudice, the peremptory writ denied, and the case remanded to the trial court to allow the people an opportunity to comply with the new rule.

Since the instant case comes before us on direct appeal after a conviction, we are not allowed the luxury of sending it back to allow the prosecution to comply with the new rule. Ours is a simple black or white determination—affirm or reverse.

---

[1]In the instant case everyone concedes that Colangelo was a material witness.

It is unfortunate that in this case neither the trial judge nor the prosecutor was blessed with the foresight to anticipate *Eleazer*. It is entirely possible that, in fact, the prosecution did make a good faith effort to locate Colangelo. Unhappily, lacking the gift of divination, the district attorney did not make the record he may well have been able to make as regards good faith efforts to locate Colangelo. Being bound by the record and not by what might have occurred, we must hold that the record in this case does not disclose compliance with *Eleazer*.

Thus, the crucial question in this case becomes whether *Eleazer* shall be applied prospectively or retroactively.

Initially, we would observe that we are clearly dealing with a constitutional question. *Eleazer* held that due process required that the prosecution undertake reasonable efforts in good faith to locate the informer so that either party or the court itself could, if it desired, subpoena him as a witness.

*Linkletter* v. *Walker*, 381 U.S. 618, 638 [14 L.Ed.2d 601, 613, 85 S.Ct. 1731], established the principle that in criminal litigation concerning constitutional claims, the court may in the interest of justice make the rule prospective when the exigencies of the situation require such application. Obviously, when the court has altered its course, it is highly undesirable to overturn decisions reached fairly under previous practices except in the most compelling circumstances. We must, in determining prospectivity or retroactivity, choose between competing values.

*Stovall* v. *Denno*, 388 U.S. 293, 297 [18 L.Ed.2d 1199, 1203, 87 S.Ct. 1967], held that the criteria guiding resolution of the question of retroactivity implicates (a) the purpose to be served by the new standards; (b) the extent of the reliance by law enforcement authorities on the old standards; and (c) the effect on the administration of justice of a retroactive application of the new standards.

*Stovall* further pointed out that the retroactivity or nonretroactivity of a rule is not automatically determined by the provision of the Constitution on which the rule is based. "Each constitutional rule of criminal procedure has its own distinct function, its own background of precedent, and its own impact on the administration of justice, and the way in which these factors combine must inevitably vary with the dictate involved." (*Stovall* v. *Denno, supra,* 388 U.S. 293, 297.)

We examine *Eleazer* in the light of the three-pronged test established by *Stovall*.

(a) *The purpose to be served by the new standards.*

*Desist* v. *United States,* 394 U.S. 244, 251 [22 L.Ed.2d 248, 256, 89 S.Ct. 1030], makes it clear that if the purpose of the rule *clearly favors* retroactivity, it will be so declared and the court will not undertake to weigh the factors of *reliance* by law enforcement and *subsequent burden* on the administration of justice.

Obviously, in the instant case, we are dealing with the problem of confrontation. However, we are dealing with it in an indirect way. While the purpose anticipated by the new rule is the enhancement of the integrity of the fact finding process by adding a new dimension to the duty of the prosecution to make available a potential witness, this is not to say that the old rule denied confrontation and the new rule provides for it. If this were the case, we would simply say that the new rule clearly favors retroactivity. A denial of the right of confrontation obviously denies a fair trial and due process of law. (*People* v. *Kiihoa, supra,* 53 Cal.2d 748, 752.) However, the old rule did not deny confrontation—rather, it provided for confrontation. There was nothing fundamentally unfair about pre-*Eleazer* practices. The new rule merely modified the old rule by enlarging the possibility of effective confrontation. Thus, we hold that the purpose of the new standard does not clearly favor retroactivity.

We must then proceed to an examination of *Eleazer* in the light of the other two aspects of the *Stovall* test.

(b) *The extent of the reliance by law enforcement authorities on the old standards.*

Since at least 1957 (*Roviaro* v. *United States,* 353 U.S. 53 [1 L.Ed.2d 639, 77 S.Ct. 623]; *People* v. *Lawrence,* 149 Cal.App.2d 435 [308 P.2d 821]), law enforcement authorities have relied on the old standard that their only duty was to disclose information in their possession as to the identity and location of the informer who was a material witness. There is no possible way to estimate the number of cases which have been tried during the last 13 years in which the old standards have been applied. Certainly, the volcanic eruption of narcotic cases (which currently account for the lion's share of informer situations) during that period of time would indicate that the number of cases involving informers during that 13-year period has been considerable.

While the informer may, in many cases, be an odious creature, he is the lifeblood of effective narcotic investigation or for that matter any investigation into commercial, organized crime. We may safely assume that law enforcement officials complied in most cases reluctantly with even the old standards because of their desire to protect the informers. Thus, it is a

fair assumption that the number of cases in which the *Eleazer* standard had been complied with in the past is miniscule.

(c) *The effect on the administration of justice of a retroactive application of the new standards.*

We have no way of knowing with actuarial certainty the number of cases in which the pre-*Eleazer* or post-*Eleazer* concept is or could have been an issue. At oral argument, the Attorney General advised us that there are a substantial number of cases now on direct appeal in which *Eleazer* has become an issue. While the holding in this case would only be as to those cases on direct appeal as contrasted with the holding of total retroactivity which would open a floodgate of writs on cases long since tried, we cannot in good conscience distinguish between partial retroactivity and total retroactivity. In the balancing of the scales, if a person who was convicted in 1969 under the pre-*Eleazer* standards has been denied due process, then certainly a person convicted in 1957 under those standards has similarly been denied due process. Any effort to distinguish between a person who is lucky enough to have had his case on direct appeal when *Eleazer* was decided, and a person whose judgment was final on that date, would involve an exercise in the elevation of form over substance.

In our opinion the effect on the administration of justice of a retroactive application of the *Eleazer* standards would be devastating. Without access to exact percentages, we are aware that narcotic prosecutions account for an uncomfortably high percentage of the total felony caseload in our superior courts. Again, we are aware that those prosecutions which involve commercial sales almost invariably involve informers. To allow retroactive application of a rule, which is at most, but a refinement of a preexisting procedure, which afforded effective recognition of the rights of the individual charged with crime would impose an impossible burden on the administration of criminal justice simply from the standpoint of the number of cases involved.

But further, retroactive application of the *Eleazer* rule would present the court system with a further practical problem. An informer is a skittish creature inclined to be highly transitory. Once he has been identified, he becomes highly unpopular and is not inclined to tarry and renew old friendships with those on whom he has informed. Were *Eleazer* type cases to be returned for retrial, the chances of locating the average informer would be slim. Thus, were *Eleazer* to be applied retroactively, a further question would present itself: When does the prosecution have the burden of exercising its good faith attempt to locate him?

Were the courts to opt for the date of retrial, the system of criminal

justice would be forced into indulging an exercise in futility, unlikely to inure to the benefit of the defendant. The informer will be gone—as in the instant case. The prosecution can attempt in the utmost good faith to locate the informer, all to no avail, and the most diligent efforts will not benefit the defendant in the slightest.

Alternatively, were the courts to select as the applicable date that of the original trial, the result would almost invariably be a dismissal of a case against a defendant who has been found guilty by established standards, for rarely could the prosecution represent in good faith that it had undertaken reasonable efforts to locate the informer. A holding of retroactivity could be made only with a cavalier disregard for the realities of the administration of criminal justice. Therefore, we hold that *Eleazer* applies only to cases which were tried after January 30, 1970.

Judgment affirmed.

Kerrigan, J., and Gabbert, J., concurred.