[Crim. No. 18122. Second Dist., Div. Two. Mar. 1, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
ALAN EDWARD CAIN, Defendant and Appellant.

## COUNSEL

Jerry D. Whatley for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**COMPTON, J.**—In an investigation conducted during the month of July 1969, agents of the Bureau of Narcotic Enforcement of the State of California, together with officers of the Santa Barbara sheriff's office, amassed overwhelming evidence of the fact that defendant Alan Edward Cain was the central figure in a well organized conspiracy to market large quantities of illicit heroin in the County of Santa Barbara.

The agents were assisted in their endeavor by one Edward Braithwaite, a civilian operator.

A grand jury indictment returned August 12, 1969, followed by a jury trial resulted in defendant's conviction of conspiracy and seven counts of sale of heroin. Sentence was to the state prison. Defendant appeals.

In what might aptly be described as a colossus of understatement, defendant's counsel asserts in his opening brief that "the record in the case may create a very strong inference of his guilt of very serious crimes, . . ." Consequently, defendant raises no issue of the sufficiency of the evidence.

Defendant's assault on the judgment rests on four contentions: (1) That the prosecution failed to call Braithwaite as a witness and improperly failed to take appropriate steps to insure his availability; (2) that the court erroneously admitted into evidence five $20 bills which had been recovered from defendant's safety deposit box; (3) that the court erroneously admitted into evidence a tape recorded conversation between Braithwaite and defendant; and (4) that the court erroneously refused to instruct the jury on the issue of entrapment.

Even though the sufficiency of the evidence is unquestioned, a brief recounting of the facts is essential to an analysis of defendant's contentions.

Braithwaite, an informer for the Santa Barbara sheriff's office, was introduced by officers of that department to two agents of the state Bureau of Narcotic Enforcement in early July of 1969.

On July 9, 1969, Braithwaite telephoned defendant and indicated a desire to purchase heroin. A state agent monitored this conversation.

Defendant instructed Braithwaite to meet him at a designated location in Santa Barbara. The location was a Shell service station.

The officer and the informant proceeded to the location and in about 15 minutes were met by one Richard Cobb who asked for the money. After quibbling over which would come first, the heroin or the money, Cobb left and in a few minutes defendant Cain appeared with Cobb.

In a conversation punctuated with the all too familiar jargon of the narcotics peddler, defendant left no doubt that he was the boss of the operation, that he used subordinates to conduct his business and that any purchases of heroin would have to be on his terms, cash before delivery. The parties separated without consummating a purchase.

Two more telephone calls to defendant ensued and on the following day Cobb appeared at the meeting place, presented the officer with a written price list, took $50 of recorded state funds and departed. Shortly thereafter defendant appeared with one Dale Tudor. After inquiring whether Cobb had returned and receiving a negative reply, defendant and Tudor left only to return a short time later. Defendant was observed to hand balloons of heroin to Tudor who made the delivery to Braithwaite who was seated in a car with the state agent.

These activities were observed by other law enforcement agents who were in the area occupying various vantage points.

This pattern of activity with some variations was repeated on several occasions throughout the rest of July. All in all, Braithwaite made seven purchases of heroin.

The state agents personally observed four transfers of heroin from defendant, or one of his confederates, to Braithwaite.

On three occasions the transfers were out of sight of the officers, but prior thereto Braithwaite was searched and found to be without contraband. He was given money and after contact with the defendant or his salesman, was found to be without the money but in possession of heroin.

On at least three occasions defendant spoke directly to a state agent concerning his self-imposed ground rules for selling heroin. In one of these conversations defendant stated that he made purchases of as much as $8,000 worth of heroin.

On July 23, 1969, Braithwaite, at the time of making a purchase, was equipped with a concealed Fargo transmitter. The resulting tape recording

of the conversation between defendant and Braithwaite was played to the jury.

The officers took both moving and still pictures showing the activities of the defendant and Braithwaite at the service station on July 16, 1969, the date of three of the sales.

Subsequently when defendant was arrested, a key to a safety deposit box was found on his person. A search of that box disclosed the presence of five $20 bills which had been used by Braithwaite to purchase heroin on July 16, 1969. The serial numbers of the bills had been previously recorded by the state agents.

The defendant offered no evidence.

### THE FAILURE TO PRODUCE BRAITHWAITE

The indictment was returned August 12, 1969. On September 24, 1969, defendant moved for disclosure of the identity and location of the informer.

The officers identified Braithwaite and indicated that their last contact with him was August 15, 1969. They gave his address in Santa Barbara as they knew it on August 15. They further testified that on their last contact with Braithwaite they were in effect guarding him because of information they had that defendant and a confederate planned to kill him. Thus, Braithwaite's absence is easily understood and there is no evidence that the authorities ordered or encouraged his departure.

Information acquired by the officers after August 15 was that Braithwaite had either returned to his home in Norfolk, Nebraska, or had moved to San Francisco.

While conceding that they had made no effort to maintain contact with Braithwaite, the officers apparently disclosed all the information which they had. They thus complied with the law as it then existed.

Defendant asserts that the failure to produce Braithwaite denied him a fair trial, citing *Eleazer* v. *Superior Court,* 1 Cal.3d 847 [83 Cal.Rptr. 586, 464 P.2d 42].

The mandate of *Eleazer,* requiring the prosecution to take reasonable steps to produce an informer who was also a percipient witness, should not be applied to a situation where contact with the informant was lost prior to January 30, 1970, the date of the *Eleazer* decision. (*People* v. *Pargo,* 11 Cal.App.3d 528 [89 Cal.Rptr. 857], hg. den. Nov. 18, 1970.)

Defendant admits that this is the state of the law but suggests that the

use in this case of the tape recording depicting Braithwaite in conversation with defendant requires a different rule.

We disagree.

In each case which has dealt with the prospective application of *Eleazer,* the informer participated in a sale of narcotics. The activities and in some cases the words of the informer and the defendant were recounted by an officer who witnessed the transaction. (See *People* v. *Pargo, supra; People* v. *Fortier,* 10 Cal.App.3d 760 [89 Cal.Rptr. 210]; *People* v. *Helmholtz,* 10 Cal.App.3d 441 [88 Cal.Rptr. 743].)

Whatever benefit a defendant may hope to derive from the availability of the informant, it is at least as great in those cases where the evidence takes the form of testimony by officers as it is where the evidence is electronically reproduced. Thus we see no need to modify our decision in *Pargo.*

## THE FIVE $20 BILLS

As indicated above these disputed items of evidence were found in defendant's safety deposit box after key thereto was found on defendant's person.

The search of the safety deposit box was conducted under the authority of a search warrant.

Santa Barbara Deputy Sheriff Prince prepared the affidavit for the search warrant. He was furnished a list of the serial numbers of currency which the state agents had supplied to Braithwaite.

At the time of the preparation of the affidavit, the state agent, who was based in Los Angeles, had not provided Prince with the complete list. As a consequence the five $20 bills in question were not included in the affidavit nor the search warrant but were discovered when the officers were searching for the bills which were listed. ■ Defendant contends that this was a defect fatal to their seizure and subsequent introduction into evidence. We disagree.

The search warrant directed the officers to search for certain bills identified by serial numbers. This process required an examination of the bills found in the safety deposit box. In coming across identifiable bills which were evidence of the crime they were investigating the officers were not required to blind themselves to their existence. (*Skelton* v. *Superior Court,* 1 Cal.3d 144 [81 Cal.Rptr. 613, 460 P.2d 485]; *People* v. *Superior Court,* 9 Cal.App.3d 203 [88 Cal.Rptr. 21].)

The money was the lawful property of the State of California. As the court said in *Skelton, supra,* no purpose would have been served by requiring the officers to return to the magistrate to obtain a second warrant for the seizure of five bills.

 The more critical issue raised by defendant is the validity of the search warrant itself.

As noted above the affidavit was prepared by Deputy Sheriff Prince who, while a member of the investigating team, apparently did not have first hand knowledge of the events to the same extent that the state agents did. That portion of his affidavit as is pertinent to this decision reads as follows:

"That your affiant is a deputy sheriff employed by the County of Santa Barbara for five (5) years and is presently assigned to the detective bureau, narcotic detail.

"That he has been informed by Agent Arthur Scotland, California State Bureau of Narcotic Enforcement, that on July 10, 1969, July 16, 1969, July 23, 1969, and July 30, 1969, phone calls were initiated to Alan Edward Cain and in each instance a conversation was held with Alan Edward Cain concerning the sale and purchase of heroin, a narcotic; that on July 10, 1969, July 16, 1969, and July 23, 1969, the phone sale negotiations were consummated by the said Alan Edward Cain delivering a quantity of heroin to an undercover operator acting in the employ and under the direction of Agent Scotland; that the phone sale negotiation of July 30, 1969, was consummated by a delivery of a quantity of heroin to the said undercover operator acting in the employ and under the direction of Agent Scotland; that in each instance, California state funds were used to purchase said heroin with the serial numbers of all currency having been previously recorded and made a part of the official reports of the state Bureau of Narcotic Enforcement.

"That on July 31, 1969, the said Alan Edward Cain was arrested for violation of the state narcotic laws and a search conducted of his person, vehicles and residence for the previously recorded state funds with negative results. However, on a key ring containing numerous keys which was taken from the person of the said Alan Edward Cain was a safety deposit box key bearing number 413.

"That on August 4, 1969, said safety deposit box key number 413 was traced to the First Western Bank, 1036 State Street, Santa Barbara, California."

 At the threshold of our analysis of the affidavit in question we are met with the following language from *People* v. *Benjamin,* 71 Cal.2d

296 at page 302 [78 Cal.Rptr. 510, 455 P.2d 438]: "The question before us is whether—taking together the allegations based upon the officers' observations and the hearsay statements of the informant—the affidavit as a whole sets forth facts 'such as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain, a strong suspicion of the guilt of the accused.' [Citation.]

" 'The warrant can be upset only if the affidavit fails *as a matter of law* to set forth sufficient competent evidence supportive of the magistrate's finding of probable cause since it is the function of the trier of fact, not the reviewing court, to appraise and weigh evidence when presented by affidavit as well as when presented by oral testimony. [Citations.]' "

It is readily apparent that no reasonable magistrate upon reading this affidavit could have concluded otherwise than that there was a strong suspicion that defendant was a seller of heroin and in possession of the state funds.

This basic test is refined by the so-called "two-pronged test" enunciated in *Aguilar* v. *Texas,* 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509], as follows: (1) The affidavit must allege the informant's statement in language that is factual rather than conclusionary and must establish that the informant spoke with personal knowledge of the matters contained in such statement, and (2) the affidavit must contain some underlying factual information from which the magistrate issuing the warrant can reasonably conclude that the informant was credible or his information reliable.

Defendant points out that the affidavit fails to state that agent Scotland had personal knowledge of the telephone calls and transactions, the so-called "first prong" of *Aguilar.* Obviously the "second prong" is satisfied. Scotland's official position would qualify him as a reliable informant.

In *People* v. *Hamilton,* 71 Cal.2d 176 at page 181 [77 Cal.Rptr. 785, 454 P.2d 681], the court stated, ". . . we do not reject the possibility that an informant who fails to provide factual allegations of his own experience might nevertheless provide a description of the contraband itself or its particular location so detailed as to warrant the *inference* of personal observation, . . ." (Italics added.)

While this affidavit could have been totally immunized from attack by the simple insertion of words to the effect that Scotland personally overheard the telephone calls and observed the sales (a fact which the record discloses to be true) we are of the opinion that personal knowledge on the part of Scotland is clearly inferable from the positive averments and the precise dates together with the statement that the operator was working under the control of Scotland.

■ In the final analysis the main thrust of the exclusionary evidence rule is to, wherever possible, interpose a magistrate between the police and the defendant, and to encourage the use of search warrants by law enforcement officers. The purpose of the rule is not simply to test the legal writing ability of policemen. As Justice Mosk in his dissent in *People* v. *Hamilton, supra,* at page 183, so eloquently stated: "If reviewing courts are to insist that affidavits for warrants be drafted with the finesse of a Montgomery Street contract, the result will be discouraging to law enforcement agencies that desire to employ warrant procedures. After all, it is much simpler for police officers to rely upon probable cause. I would demonstrate more tolerance of affidavits for warrants, and would begin with the one involved in this case." ■ The affidavit here was sufficient.

### ADMISSIBILITY OF THE TAPE RECORDING

■ Defendant next complains that the manner of obtaining the recorded conversation between defendant and Braithwaite constituted an unreasonable search and seizure citing *Katz* v. *United States,* 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507].

With commendable candor defendant's counsel states in his brief: "However criminally oriented defendant's motives may have appeared to have been in seeking to keep his conversations private, it is undeniable that he went to great lengths to not speak to governmental agents. . . ." Be that as it may, defendant's contention is adequately answered by *On Lee* v. *United States,* 343 U.S. 747 [96 L.Ed. 1270, 72 S.Ct. 967] and *People* v. *Johnson,* 249 Cal.App.2d 425 [57 Cal.Rptr. 480] (hg. den. May 10, 1967). The tape was properly admitted.

### ENTRAPMENT

■ The trial court is required to instruct on any theory of defense *suggested b the evidence. (People* v. *Bernal,* 174 Cal.App.2d 777, 783 [345 P.2d 1 .ᵥ].) ■ The question of entrapment turns on whether or not the defendant was a person lacking in criminal intent, who was lured into the commission of crime by agents of the government. (*People* v. *Benford,* 53 Cal.2d 1, 10 [345 P.2d 928]; *People* v. *Meacham,* 256 Cal.App.2d 735 [64 Cal.Rptr. 362].)

■ The record before us discloses only that the officers afforded defendant an opportunity to transact an illicit business in which he was already engaged. (*People* v. *Walters,* 264 Cal.App.2d 834 [70 Cal.Rptr. 766].)

Rarely have we had occasion to examine a record as totally devoid of any

evidence of entrapment as this one. In disposing of this issue we need go no further than to draw attention to the fact that defendant in his initial contact with the officers presented a prepared price list for varying quantities of heroin somewhat in the fashion of a purveyor of take-out food. The trial court's refusal to instruct on the defense of entrapment was proper.

The judgment is affirmed.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied March 17, 1971, and appellant's petition for a hearing by the Supreme Court was denied April 29, 1971.