[Crim. No. 16369. In Bank. Jan. 31, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
ALBERT GOLIDAY, Defendant and Appellant.

774

COUNSELCOUNSEL

James S. Fitzpatrick for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Charles P. Just and Frank A. Iwama, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**TOBRINER, J.**—We undertake here·to examine and elaborate on the principles first announced in *Eleazer* v. *Superior Court* (1970) 1 Cal.3d 847 [83 Cal.Rptr. 586, 464 P.2d 42]. Defendant Goliday appeals from convictions in the Superior Court of Los Angeles for two counts each of unlawful sale and possession for sale of secobarbital and amphetamine tablets under Health and Safety Code sections 11912 and .11911. Both at the preliminary hearing and at trial, Goliday's counsel sought information which would help him locate two informer-eyewitnesses to the alleged sale who were neither paid nor regular agents of the police. The prosecution provided only the first names of the informers. For the reasons set forth below, we reverse the convictions for sale of restricted drugs under Health and Safety Code section 11912, and affirm the convictions for the two counts of possession for sale under Health and Safety Code section 11911. We hold that when a person who actively cooperates with the police becomes an eyewitness to a narcotics violation the police and prosecution must "undertake *reasonable efforts* in good faith to *locate* the informer so that either party or the court itself . . . could, if it so desired, subpena him as a witness." (*Eleazer* v. *Superior Court, supra*, 1 Cal.3d at p. 853.)

## I. *The Facts*

We first review the facts and testimony presented to the superior court. On July 19, 1970, Officer Nettles of the Los Angeles Police Department Narcotics Division received a telephone call from a female, identified only as "Frankie," who volunteered information concerning a narcotics dealer. The next day Officer Nettles, dressed in civilian clothes, met "Frankie" and a companion named "Sue"; this trio proceeded to the defendant's apartment for the purpose of purchasing restricted drugs; they were admitted inside while other officers waited undercover nearby. Five persons, including the defendant Goliday, were present in the apartment in addition to the two informers and Officer Nettles.[1]

What happened next became an issue critical to the charges of sale and possession for sale of narcotics. The prosecution offered only the testimony of Officer Nettles; he testified that defendant Goliday removed a paper sack from a hall closet, counted out 37 amphetamine and secobarbital capsules, handed them to Officer Nettles, and accepted $10 in payment. Officer Nettles, "Frankie," and "Sue" then left defendant's apartment.

Five minutes later Officer Johnson and other officers announced their presence, entered the apartment, and arrested the defendant. According to Officer Johnson's testimony, the police discovered several caches inside the apartment containing some 800 narcotics tablets.

Goliday pled not guilty, and, at the preliminary hearing on October 8, 1970, his defense counsel asked Officer Nettles on cross-examination how counsel could contact "Frankie" and "Sue" for possible use as defense witnesses. Officer Nettles replied, "I don't know." He testified that he did not know the last name of either of the two informers, that the police possessed no other information about the informers, and that he deliberately refrained from obtaining such information to prevent "Frankie" and "Sue" from being called as witnesses.[2] He also testified that to his knowledge

---

[1]According to police testimony, the four persons present in the apartment in addition to Officer Nettles, "Frankie," "Sue," and the defendant may not have witnessed the purported sale of narcotics since at least part of the alleged transaction occurred in a hallway.

[2]"Q: [defense counsel] Officer, what were the names of the two people you went to the place with?
"A: [Officer Nettles] Frankie and Sue.
"Q: Frankie and Sue what?
"A: That's all I know.
"    .   .   .   .   .   .   .   .   .   .   .   .   .
"Q: You can't get me any information so I can get them as witnesses?
"A: No, I cannot. I don't know.
"Q: Isn't that a little unusual not to ask them their phone number, address, ask

no other contacts occurred between the police and the informants before or after the incidents described above, and that neither "Frankie" nor "Sue" received compensation.

Five months later, at the trial on March 4, 1971, additional information concerning the informers came to light. After the trial judge ordered disclosure of "all information that the police have concerning anyone who may be a witness," the prosecution revealed that Officer Nettles had "discovered" a telephone number supplied by one of the two informers. According to Officer Nettles he found that when he dialed the number two weeks before the trial, the phone had been disconnected; he was unable to recall the date on which he obtained the number even though he earlier testified that the only police contact with "Sue" and "Frankie" occurred on July 19 and July 20, 1970.

Goliday's counsel then moved for dismissal, claiming that the prosecution's failure to supply information which might enable the defense to contact material witness informants had denied him due process of law.[3] The trial judge held that *Eleazer* v. *Superior Court, supra,* 1 Cal.3d 847, does not require the police to undertake reasonable efforts to obtain information about material witnesses who are neither regular nor paid informants.

them something about themselves, ask if they had charges against them or something?
"A: In circumstances like this it is not unusual.
"    .    .    .    .    .    .    .    .    .    .    .
"Q: And it is your testimony that over the  many years of these narcotics cases, this is the accepted way to do it?
"A: It depends on the circumstances.
"Q: What circumstances prevented you from asking their last names?
"A: This person volunteered the information to me about a narcotics dealer, and I didn't find it necessary to ask her name for fear if I did ask it I would feel obligated to tell somebody her last name.
"Q: In other words, you didn't want either one to appear as a witness?
"A: I didn't want to place her as a witness.
"Q: I want to try to find these two people for trial. How am I going to do it?
"A: I don't know."

[3]We must assume that Goliday possessed no personal knowledge about the informants which would enable defense counsel to contact them. Although Officer Johnson testified that "Sue" told him she was Goliday's ex-common law wife, Goliday later testified that he knew "Sue" only casually as a customer at a service station where he worked, that he never dated her, and that he knew neither her last name nor how to contact her; Goliday further testified that he possessed no knowledge whatever about the girl called "Frankie." Although Goliday's testimony conflicts with the foregoing hearsay testimony of Officer Johnson, the trial judge declined to find that Goliday knew how to contact the two informers. Instead, he assumed that Goliday had no such information, and ruled that, even so, the police owed no duty to make reasonable efforts to acquire information about the two girls since they were neither paid nor regular informers.

II. *The convictions under Health and Safety Code section 11912 must be reversed because the prosecution and police failed in their duty both to obtain and to disclose information by which eyewitness informants could be located.*

We first consider the defendant's convictions under Health and Safety Code section 11912 for two counts of sale of restricted drugs.

The common law informer's privilege[4]—the privilege against disclosure of the identity of persons who supply the government with information concerning the commission of crimes—now lies embedded in Evidence Code section 1041.[5] As we said in *People* v. *Garcia* (1967) 67 Cal.2d 830 [64 Cal.Rptr. 110, 434 P.2d 366], however, "the official identity-of-informant privilege must yield when it is shown that the informant whose identity is sought is a material witness for the defense and nondisclosure *would deprive the defendant of a fair trial.* In such cases, it is clear that the 'balance' is struck in favor of the defendant, and disclosure must be ordered upon pain of dismissal. . . . [O]*nly* after it [is] first determined that the informant 'is not a material witness to the guilt or innocence of the accused' " can disclosure be denied. (Italics in the original.) (67 Cal.2d

---

[4] 8 Wigmore, Evidence (McNaughton Rev. 1961) section 2374, page 761; see also Note, 76 A.L.R.2d 267; Note (1960) 33 So.Cal.L.Rev. 344.

[5] Evidence Code section 1041 provides in full: "(a) Except as provided in this section, a public entity has a privilege to refuse to disclose the identity of a person who has furnished information as provided in subdivision (b) purporting to disclose a violation of a law of the United States or of this state or a public entity in this state, and to prevent another from disclosing such identity, if the privilege is claimed by a person authorized by the public entity to do so and:                ,

"(1) Disclosure is forbidden by an act of the Congress of the United States or a statute of this state; or

"(2) Disclosure of the identity of the informer is against the public interest because there is a necessity for preserving the confidentiality of his identity that outweighs the necessity for disclosure in the interest of justice; but no privilege may be claimed under this paragraph if any person authorized to do so has consented that the identity of the informer be disclosed in the proceeding. In determining whether disclosure of the identity of the informer is against the public interest, the interest of the public entity as a party in the outcome of the proceeding may not be considered.

"(b) This section applies only if the information is furnished in confidence by the informer to:

"(1) A law enforcement officer;

"(2) A representative of an administrative agency charged with the administration or enforcement of the law alleged to be violated; or

"(3) Any person for the purpose of transmittal to a person listed in paragraph (1) or (2).

"(c) There is no privilege under this section to prevent the informer from disclosing his identity."

Evidence Code section 1042, subdivision (d) establishes procedures, including *in camera* disclosures, to aid the trial judge in determining whether the section 1041 privilege applies in a particular case.

at pp. 842-843; *Honore* v. *Superior Court* (1969) 70 Cal.2d 162 [74 Cal. Rptr. 233, 449 P.2d 169].)[6]

Although originally this duty to disclose the identity of a material witness required only that the prosecution reveal information actually in its possession, in *Eleazer* v. *Superior Court, supra,* 1 Cal.3d 847, we extended the prosecution's obligation and required, in addition, reasonable steps *to locate or obtain* information about such informants. If "through police tactics or happenstance [an] informer becomes a material witness, the police should make such inquiries and arrangements as are reasonably necessary to enable the prosecution and defense to locate him." (1 Cal.3d at p. 852.) We recognized the futility of a rule requiring disclosure of the information which the police know about a material witness informer without a further requirement that the police make efforts to obtain information useful in locating the informer as well. We noted, however, that "[d]ue process requires only that the police and the district attorney undertake *reasonable efforts* in good faith to *locate* the informer so that either party or the court itself (see Evid. Code, § 775) could, if it so desired, subpena him as a witness." (Italics in the original.) (1 Cal.3d at p. 853.)

A. ▮ *The police and prosecution failed to undertake reasonable efforts to obtain information by which the defense could locate the two eyewitnesses.*

Applying the principles set forth above to the instant case, we note that both "Frankie" and "Sue" were clearly "material witnesses on the issue of guilt" since they were eyewitness participants to the alleged sale. (*People* v. *Garcia, supra,* 67 Cal.2d at p. 837; *People* v. *Durazo* (1959) 52 Cal.2d 354, 356 [340 P.2d 594, 76 A.L.R.2d 257]; *People* v. *Williams* (1958) 51 Cal.2d 355, 359 [333 P.2d 19].) ▮ We need not speculate about what "Frankie" and "Sue" might have revealed as witnesses; an accused need show only a possibility that a material witness might testify favorably on his behalf; a defendant "need not prove conclusively before disclosure the very fact [he] seek[s] to obtain through disclosure." (*People* v. *Perez* (1965) 62 Cal.2d 769, 773-774 [44 Cal.Rptr. 326, 401 P.2d 934]; *Price* v. *Superior Court* (1970) 1 Cal.3d 836, 843 [83 Cal.Rptr. 369, 463 P.2d 721].) Here, for example, the two informers might have supported the defendant's plea of innocence to the sale counts by testifying that the de-

---

[6]While we were interpreting a statute (Evid. Code, § 1041) in *Garcia* we also noted that the decision was based upon the "due process provisions of the state and federal Constitutions." (*People* v. *Garcia* (1967) *supra,* 67 Cal.2d 830, 842.) California cases relating to the disclosure of informers' identities are collected in 54 Cal.Jur.2d, Witnesses, section 45, page 305.

fendant declined to sell restricted drugs to Officer Nettles. The prosecution, therefore, owed a duty to disclose the "identity" of the two eyewitness informers at the preliminary hearing as well as at trial. (*Mitchell* v. *Superior Court* (1958) 50 Cal.2d 827, 829 [330 P.2d 48].)

■ The prosecution in the present case conceded its duty to give to the defense all the information that it had about the informants; the question presented to us turns on whether the prosecution can avoid the *additional* duty to obtain information, which we announced in *Eleazer* v. *Superior Court, supra,* 1 Cal.3d 847. The Attorney General contends that the *Eleazer* rule applies only in cases involving a regular or compensated police informant. He emphasizes the following statement taken from a footnote of our *Eleazer* opinion: "In imposing a duty to undertake reasonable efforts to locate an informer we mean by an 'informer' a person who regularly supplies information to the law enforcement agency, or who is compensated for the furnishing of information." (*Eleazer* v. *Superior Court, supra,* 1 Cal.3d at p. 853, fn. 10.)

This language, the Attorney General contends, controls the instant case since "Frankie" and "Sue," according to the testimony before the superior court, supplied information on one occasion only and received no payment from the police. We set forth below the reasons why we have concluded that the footnote is not controlling.

In the first place, the Attorney General places an unwarranted emphasis on dictum. *Eleazer,* of course, involved a paid informer who participated in some 20 narcotics purchases while working with a police undercover agent. The *Eleazer* footnote on which the Attorney General relies merely reflected the factual setting and actual holding of that case; we did not foreclose consideration of the duty of the police and prosecution in other situations, and to the extent that the footnote can be interpreted otherwise, we disapprove it here.

Second, it is often difficult, if not impossible to know whether an informer provides information "regularly." *People* v. *Fortier* (1970) 10 Cal.App.3d 760 [89 Cal.Rptr. 210], illustrates the problem. There the defense sought disclosure of the identity of a female informer who accompanied two undercover police officers on an alleged narcotics "buy"; the prosecution could supply no useful information about the informer since the officers knew only her first name. The prosecution contended that the *Eleazer* duty to undertake "reasonable" efforts to acquire additional information did not apply since one of the undercover officers testified that "*he* met the [informer] on this one occasion, only, and [that] *he* did not pay her anything." (Italics added.) (10 Cal.App.3d p. 767.) The Court of Appeal rejected

this contention noting that the "testimony [was] of little value in showing whether [the informer] was regularly supplying information . . . for compensation" to other policemen. (10 Cal.App.3d at p. 767.) Although holding *Eleazer* inapplicable because that decision has not been given retroactive effect,[7] the *Fortier* court declared that, otherwise, *Eleazer* would have applied since the police officer's testimony failed to prove that the informer was neither a paid nor regular agent of the police.

The Attorney General seeks to distinguish *People* v. *Fortier* by arguing that in the instant case the question whether *other* police officers, in addition to Officer Nettles, received information from "Frankie" or "Sue" "was explored at length" at trial. This argument lacks confirmation in the record. Officer Nettles testified that *to his knowledge* neither "Frankie" nor "Sue" worked with the police before or after the incidents leading to Goliday's arrest. On cross-examination Officer Nettles reported that he checked with "several," *but not all,* of his fellow officers in the narcotics division; he further testified that he made no inquiry concerning "Frankie" or "Sue" to officers in other divisions. On this ambiguous record we cannot say that the prosecution adequately fulfilled its duty to probe the relationship between the police and the eyewitness informers. As in *People* v. *Fortier,* "the testimony is of little value in showing whether or not [the informers were] regularly supplying information to the police department." (10 Cal. App.3d at p. 767.)

The impossibility, from a practical standpoint, of determining whether an informer received "compensation" is further demonstrated by the testimony in this case. Officer Nettles testified that "Frankie" and "Sue" were not "compensated" *by him.* He could not speak for other officers. Nor can we assume that Officer Nettles understood the technical meaning given the word "compensation" by the courts. *"Compensation may be cash . . . but may also consist of promises of immunity or of lessened charges or punishment."* (Italics added.) (*Eleazer* v. *Superior Court, supra,* 1 Cal.3d at p. 853, fn. 10.)

Since "Frankie" and "Sue" acted under the "immediate supervision" of Police Officer Nettles, they enjoyed a statutory immunity from prosecution for their part in arranging the particular sale of narcotics involved here. (Health & Saf. Code, § 11710.) The police, however, frequently make additional promises to informers such as immunity from arrest for unre-

---

[7]Accord, *People* v. *Austin* (1971) 16 Cal.App.3d 699 [94 Cal.Rptr. 437]; *People* v. *Cain* (1971) 15 Cal.App.3d 687 [93 Cal.Rptr. 388]; *People* v. *Gonzales* (1971) 14 Cal.App.3d 881 [92 Cal.Rptr. 660]; *People* v. *Pargo* (1970) 11 Cal.App.3d 528 [89 Cal.Rptr. 857]; *People* v. *Helmholtz* (1970) 10 Cal.App.3d 441 [88 Cal.Rptr. 743].

lated violations of the narcotics laws (see, e.g., *People* v. *Cheatham* (1971) 21 Cal.App.3d 675, 677, fn. 2 [98 Cal.Rptr. 670]), and the record before us fails to reveal whether such guarantees of immunity or other "favors" occurred here. Indeed, without a comprehensive perusal of all police records and the systematic questioning of other police officers and other police departments in every case, we could never be assured that an informer was not a "regular" or "compensated" police agent.

Third. and most importantly, the policies underlying our decision in *Eleazer,* and the long line of cases preceding it, dictate that the police should undertake reasonable efforts to obtain information about all material witness informants who served as active agents of the police. As we have seen, fairness to the accused outweighs the informer's interests in anonymity if and when he becomes a material witness on the issue of guilt. In *Eleazer,* we recognized the futility of a rule requiring disclosure of the information that the police have about a material witness without a further requirement that the police make reasonable efforts to *obtain* useful information as well. A defendant's right to a fair trial deserves no less respect where "the police . . . make no effort to learn the residence of the informer or to establish a way by which to locate him." (1 Cal.3d at p. 852.)

The soundness of this controlling principle of *Eleazer* finds graphic illustration in the instant case. Here, the police themselves made two informants into eyewitness-participants in a narcotics transaction; the police then *deliberately* failed to obtain the last names and addresses of these informants in order to prevent them from being subpoenaed as defense witnesses. "That the police did so without motive to harm the defendant, but to foster the security of the informer, does not afford a sufficient justification . . . [for] 'depriving the defendant of a fair trial.'" (*Eleazer* v. *Superior Court, supra,* 1 Cal.3d at p. 852; see also *People* v. *Kiihoa* (1960) 53 Cal.2d 748, 754 [3 Cal.Rptr. 1, 349 P.2d 673].) ■ We do not, however, rely on the *subjective* intent of the police; the defendant is denied a fair trial whenever the police fail to undertake reasonable efforts to obtain information useful for locating a material witness informer who served as an active agent of the police.

Nor does the happenstance that the informers were neither paid nor regular agents of the police provide a justification for the failure to undertake efforts to obtain such information. ■ "The fact that [an informer] does not regularly provide information and is not paid should, if anything, make his testimony more credible and, hence, of more potential value to both prosecution and defense." (Louisell and Wally, Modern Cal. Discovery (2d ed. 1972) p. 877.)

We emphasize that the eyewitness informers involved here acted as police agents at the time of the alleged sale. ■ The police bear no duty to obtain information about a person who is not a material witness, who "simply points the finger of suspicion toward a person who has violated the law. He puts the wheels in motion which cause the defendant to be suspected and perhaps arrested, but he plays no part in the criminal act with which the defendant is charged." (*People* v. *Lawrence* (1957) 149 Cal.App.2d 435, 450 [308 P.2d 821].) If, however, a material witness serves as an agent of the police and becomes a material witness on the issue of guilt, his desire for anonymity must yield to the interest of the accused in a fair trial. The police, accordingly, must undertake reasonable efforts to obtain information by which the defense may locate such an informer. They did not do so here.

B. *The police and prosecution also failed in their duty to disclose all the information about the two eyewitness informants which was actually in the possession of the police.* ·

■ The failure of the police to disclose, in timely fashion, the telephone number supplied by one of the informers provides an additional, and independent, ground for reversing the conviction for sale of narcotics. Since "Frankie" and "Sue" were material witnesses on the issue of guilt, disclosure was required, upon request, at the preliminary hearing. (*Mitchell* v. *Superior Court* (1958) 50 Cal.2d 827, 829 [330 P.2d 48].) "What must be disclosed is the witness's 'identity'; not merely his name, but all pertinent information which might assist the defense to locate him." (*Eleazer* v. *Superior Court, supra,* 1 Cal.3d at p. 851; *People* v. *Diaz* (1959) 174 Cal.App.2d 799, 802 [345 P.2d 370].)

Here, one of the informants admittedly gave the police a "contact" telephone number; at the preliminary hearing the prosecution told defense counsel that it knew of no method of locating either informant; the prosecution disclosed the telephone number only on March 4, 1971—some five months after the preliminary hearing. Although the officers could not remember when they obtained this number, we cannot assume that they obtained it after July 19 or July 20, 1970, since the police witnesses testified that their only contacts with "Frankie" and "Sue" occurred on those dates.[8]

---

[8]Even if the police obtained the telephone number after the preliminary hearing, we doubt that the result would be different. If the defense seeks information about material witnesses at a preliminary hearing and the prosecution and police state that none exists, we do not believe that we overburden the prosecution or police by requiring them to notify the defense about later-acquired information by which the witnesses might be located.

We do not intimate that the failure to disclose the "contact" telephone number at the preliminary hearing occurred for reasons other than inadvertence; "motives and purposes cannot prevail when, as here, they inevitably result, intentionally or unintentionally, in depriving the defendant of a fair trial." (*People* v. *Kiihoa, supra,* 53 Cal.2d at p. 754.) Nor was the failure to disclose the telephone number rendered harmless by the belated discovery, only two weeks before trial, that the number had been disconnected; disclosure at the preliminary hearing months earlier might well have enabled defense counsel to contact "Frankie" or "Sue" before their departure.

III. ██ *The conviction for two counts of violating Health and Safety Code section 11911 should not be reversed since the undisclosed informants were not material witnesses on the issue of possession for sale.*

Although we have held that the convictions for sale of narcotics should be reversed, we find no basis for reversal of the counts relating to possession for sale. Our decision in *People* v. *Garcia, supra,* 67 Cal.2d 830, requires reversal only upon a failure to disclose an informer who is a material witness on the issue of guilt. ██ The only elements necessary to establish a violation of Health and Safety Code section 11911 are possession of a restricted drug and a purpose to sell it. (*People* v. *Hunt* (1971) 4 Cal.3d 231, 236 [93 Cal.Rptr. 197, 481 P.2d 205]; *People* v. *Allen* (1967) 254 Cal.App.2d 597, 600-601, 602 [62 Cal.Rptr. 235].) The record before us establishes both of these elements without reference to anything that the informers might have witnessed while accompanying Officer Nettles during the purported sale.

██ Turning first, to the element of possession, we note that the defendant clearly exercised "dominion and control" over the caches of narcotic capsules found in his apartment. No suggestion appears in the record that "Frankie" or "Sue" could have "planted" the several caches scattered throughout the apartment,[9] and the defense offered no other explanation for the presence of the narcotics.

██ As to the element of purpose necessary to support a conviction for possession for sale, the large quantity of narcotics found in the defend-

[9] The defendant himself testified that his earlier contact with the informers was limited to casual acquaintance with "Sue" at the service station where he worked. Compare *People* v. *Perez* (1965) 62 Cal.2d 769 [44 Cal.Rptr. 326, 401 P.2d 934], in which we held that an informer was a material witness on the issue of possession since the informer himself might have hidden the narcotics found in a room rented for the Mexican national defendants, newly arrived in this country, by an unknown man.

ant's apartment raised an inference that defendant intended to sell them.[10] The police discovered some 800 capsules of restricted drugs hidden in various places in the apartment, and Officer Johnson testified that, based on this large number of capsules, he concluded that the defendant held them for sale. If the inference that the defendant possessed the drugs for sale had rested solely on the alleged narcotics transaction with Officer Nettles, the defendant's access to the eyewitness informers might have been crucial to his defense. We face, however, a different case. Here the large quantity of narcotics properly supports an inference that the defendant intended to sell them (*People* v. *Allen* (1967) 254 Cal.App.2d 597, 603 [62 Cal.Rptr. 235]). Therefore, the defendant did not suffer a denial of a fair trial by the absence of the informants.

We reverse the convictions for the two counts of sale of restricted drugs under Health and Safety Code section 11912 and affirm the convictions for the two counts of possession for the sale under Health and Safety Code section 11911.

Wright, C. J., McComb, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

---

[10]The defense offered no evidence that the defendant obtained drugs by prescription for his personal use. Compare *People* v. *Hunt* (1971) 4 Cal.3d 231 [93 Cal.Rptr. 197, 481 P.2d 205].