[No. B016519. Second Dist., Div. Four. Feb. 23, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
ERNEST PINA GUERECA, Defendant and Appellant.

## Counsel

Kenneth Cloke, under appointment by the Court of Appeal, and Judy Weissberg-Ortiz for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Gary R. Hahn and Linda C. Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**WOODS, P. J.**—Appellant Ernest Pina Guereca was convicted of two counts of selling phencyclidine (PCP). (Health & Saf. Code, § 11379.5.) He contends on appeal that his conviction must be reversed because the trial court erroneously denied his motion to disclose the identity of an informant. We find no merit in the contention, and affirm.

The evidence at trial showed that on May 12, 1983, Police Officer Edward Ortiz was working undercover in civilian clothes on a street corner. A man he had never seen before introduced himself as "Paul." The two men discussed the possibility of purchasing PCP. They went together in Ortiz's car to 3304 Sierra Street. Paul knocked on the door and appellant came out and introduced himself as "Ernie." Ortiz asked appellant for a PCP-dipped cigarette. Appellant said Ortiz would have to follow him to his house. Appellant drove a 1973 Chevrolet Monte Carlo to 4922 Gambier Street, with Ortiz and Paul following behind. Appellant went into the residence alone, and returned a few minutes later with a wet cigarette which emitted a strong chemical odor of PCP. He handed the cigarette to Ortiz in exchange for $20, stating, "It's good stuff. You can't taste the chemicals." Ortiz asked appellant where he could find him the next time. Appellant pointed to the house and said, "Right here. I live here." Ortiz dropped Paul off, and then booked the cigarette at the police station.

During the transaction, Ortiz had noticed that appellant had a tattoo of a cross on his right hand.

On June 1, Ortiz returned to the house on Gambier Street. Appellant answered the door. Ortiz told appellant he wanted $20 worth of a PCP cigarette. Appellant went inside the residence, returned to the door about three minutes later and handed Ortiz a tinfoil bindle. The bindle contained a wet Kool cigarette emitting a strong chemical odor like PCP. Ortiz handed appellant the $20 and left. He immediately booked the cigarette into evidence.

During the second transaction, Ortiz had observed that appellant had a tattoo of a flower on his left inner arm.

Ortiz returned to the house approximately four more times but found no one at home. He arrested appellant on January 11, 1984, six months after the transactions.

Ortiz further testified that he observed appellant's brother at appellant's preliminary hearing on February 22, 1984. He added that he had testified at an earlier trial and examined appellant's arms at that time. He then observed the same tattoos that he had seen at the time of the PCP purchases. However, he noticed that the tattoo of the cross was on the left hand while the tattoo of the flower was on the right arm, the reverse of what he had put in his report. He was positive that it was appellant who sold him the PCP and that the tattoos were the same ones that he had observed at the time of the buys.

On cross-examination, Ortiz testified that Paul was a complete stranger whom he never saw again. He never ascertained Paul's name, gave him no compensation, and believed that Paul was simply doing him a favor. His undercover assignment involved making contacts on the street which could lead to drug sales. He did not make immediate arrests but continued making purchases and recording information, with the arrests to be made in the future. His police report indicated that appellant appeared 33 years old, although appellant was actually 39 years old at that time.

On redirect examination, Ortiz explained that when he was working undercover and asked someone to assist him in obtaining drugs, he did not ask for the person's last name or reveal his identity as a police officer because he did not want to impede further undercover investigations in that vicinity. He admitted on recross-examination that there was a way to learn people's names and addresses without revealing his identity.

The remaining prosecution witness testified that both of the cigarettes purchased by Ortiz contained PCP.

Appellant was the sole defense witness. He denied meeting Officer Ortiz before his arrest. He admitted living at 4922 Gambier with his wife and children and also indicated that the Chevrolet Monte Carlo belonged to his teenage daughter. According to appellant, his 33-year-old brother lived at 3304 Sierra in 1983, had the tattoos on the arms which Ortiz initially indicated, and sometimes drove the Monte Carlo. The brother died in July 1984 from a drug overdose. Appellant had a tattoo of a cross on his left hand and a flower tattoo on his right arm.

Appellant had twice been to prison for prior convictions of second degree robbery, possession for sale of a controlled substance, and armed robbery.

Appellant contends on appeal that the trial court improperly denied his motion to disclose the identity of the informant Paul.

In *Eleazer* v. *Superior Court* (1970) 1 Cal.3d 847 [83 Cal.Rptr. 586, 464 P.2d 42], a paid informer,[1] who had participated in 20 narcotics purchases with the police, was a material witness to the defendant's alleged unlawful sale of seconal. The police disclosed the informant's name to the defendant but denied any knowledge of his address or any way to contact him. *Eleazer* held that "when an informer becomes a material witness to the crime, the prosecution must demonstrate that it has attempted in good faith to locate him; the duty to disclose the identity of the informer cannot be evaded by deliberate failure to acquire information necessary to find him." (1 Cal.3d at p. 849.) The court further explained that it is the prosecution's burden to provide not just the witness's name but all pertinent information which might assist the defense in locating him. (At p. 851.) The police may not decide to deliberately refrain from learning an informer's residence to foster his security where the result is a deprivation of the defendant's right to a fair trial. (At p. 852.) *Eleazer* went on: "Certainly in the present case, after the informer was shown at the preliminary hearing to be a material witness, and when he still remained in police employ, the police or district attorney should have undertaken a good faith effort at least to obtain his address or to make some arrangement under which he could be successfully subpoenaed for trial. . . ." (At pp. 852-853.)

*People* v. *Goliday* (1973) 8 Cal.3d 771 [106 Cal.Rptr. 113, 505 P.2d 537], further delineated the duty of the police to obtain information regarding an informant.

The officer in *Goliday* received a telephone call from a woman who identified herself as "Frankie" and volunteered information regarding a narcotics

---

[1]The case law uses the terms "informer" and "informant" interchangeably.

dealer. The following day the officer dressed in civilian clothes and went with "Frankie" and a companion named "Sue" to the defendant's apartment to purchase drugs. The officer made the purchase from the defendant in the presence of Frankie and Sue. After the officer, Frankie and Sue left, other officers entered the apartment. They arrested the defendant and discovered large amounts of narcotics in the apartment. The officer testified at the preliminary hearing that he did not know the last names of either Frankie or Sue and had deliberately avoided getting more information about them so they would not be called as witnesses. To his knowledge neither woman had any other contact with the police nor received compensation for providing information.

*Goliday* reversed the defendant's conviction for sale of restricted drugs on the ground he had been denied due process by the prosecution's failure to supply information which might enable him to contact the informants. The court explained that both Frankie and Sue were material witnesses on the question of guilt, as both were eyewitnesses to the alleged sale. (8 Cal.3d at p. 778.) Moreover, no speculation was permissible regarding what their testimony might be; "an accused need show only a possibility that a material witness might testify favorably on his behalf . . . ." (*Ibid.*)

The Attorney General in *Goliday* relied on a footnote of *Eleazer* which stated: "In imposing a duty to undertake reasonable efforts to locate an informer we mean by an 'informer' a person who regularly supplies information to the law enforcement agency, or who is compensated for the furnishing of information." (*Eleazer* v. *Superior Court, supra,* 1 Cal.3d at p. 853, fn. 10.) *Goliday* disapproved the footnote to the extent it could be interpreted to foreclose the duty of the police and prosecution in situations other than the factual setting and actual holding of *Eleazer.* (*People* v. *Goliday, supra,* 8 Cal.3d at p. 779.) Reliance cannot be placed on whether an informer provides information regularly or is compensated as it is impossible to know what contact may have occurred with other police officers who are not testifying. (*People* v. *Goliday, supra,* at pp. 779-781.)

The *Goliday* court also stated: "[M]ost importantly, the policies underlying our decision in *Eleazer,* and the long line of cases preceding it, dictate that the police should undertake reasonable efforts to obtain information about all material witness informants who served as active agents of the police. As we have seen, fairness to the accused outweighs the informer's interests in anonymity if and when he becomes a material witness on the issue of guilt." (8 Cal.3d at p. 781.)

Similarly, in *Twiggs* v. *Superior Court* (1983) 34 Cal.3d 360 [194 Cal.Rptr. 152, 667 P.2d 1165], an informant contacted the defendant with the express

purpose of making a "controlled buy" for the police. The defense was entrapment. The defendant knew the informant's identity, as they had been friends, but not his whereabouts. The trial court ruled that the prosecution had to furnish the informant's last known address but not any other available information regarding his current whereabouts. The defendant was unable to locate the informant at the last known address. The Supreme Court issued a peremptory writ of mandate, holding that "where it is likely that the informant cannot be located by merely providing the last known address, the trial court is under an obligation to ascertain whether the prosecution has more information and whether it has made reasonable efforts to obtain information useful in locating the informant .... Fairness to the accused requires that the prosecution bear the burden of showing that it has made reasonable efforts to maintain contact with the informant." (*Id.,* at pp. 366-367.)

It is clear from the preceding cases that in the case before us Paul was a material witness on guilt, at least as to the sales transaction which occurred in his presence.[2] Moreover, under *Goliday* no significance can be attached to the evidence that Paul was neither paid nor regularly used by the police as an informant.

We find, however, that although Paul assisted the police, he does not qualify as an "informant" for the purposes of *Eleazer, Goliday* and *Twiggs.* He never intentionally aided the police, nor was he "in police employ" (*People* v. *Eleazer, supra,* 1 Cal.3d at p. 853) or an "active agent" of the police (*People* v. *Goliday, supra,* 8 Cal.3d at p. 781). In the typical informant situation, the informant is "in contact with, and under the control of," the police and the prosecution. (*Bellizzi* v. *Superior Court* (1974) 12 Cal.3d 33, 37 [115 Cal.Rptr. 52, 524 P.2d 148]; *People* v. *Hernandez* (1978) 84 Cal.App.3d 408, 411 [148 Cal.Rptr. 567].) Where the police make arrangements to have an informant work for them, it is reasonable to expect them to obtain the informant's full name and address. The situation is entirely different where an undercover officer obtains information from a stranger who does not know that he or she is dealing with the police. Nothing in the Supreme Court's decisions requires us to hold that the officer must ask questions which might make the stranger suspicious and jeopardize the investigation or the officer's undercover status.

None of the many cases cited by the parties involves officers working undercover who obtained information from people who did not know they were associating with law enforcement. We hold that the *Eleazer/Goliday* informant disclosure requirements do not apply in this context.

---

[2]Appellant's disclosure motion in the trial court was limited to count I. On appeal, he argues the failure to disclose requires reversal of both counts I and II.

The judgment is affirmed.

Kingsley, J., and McClosky, J., concurred.