# STATE OF HAWAII, Plaintiff-Appellee, *v.* GUY CHARLES BULLEN, Defendant-Appellant

## NO. 6406

DECEMBER 9, 1980

RICHARDSON, C.J., OGATA, MENOR,
AND CIRCUIT JUDGE LUM, ASSIGNED
BY REASON OF VACANCY*

---

* This matter was submitted without oral argument prior to the retirement of Justice Kobayashi on December 29, 1978. HRS § 602-10 (1979 Supp.) provides: "After oral argument of a case, if a vacancy arises or if for any other reason a justice is unable to continue on the case, the case may be decided or disposed of upon the concurrence of any three members of the court without filling the vacancy or the place of such justice."

## OPINION OF THE COURT BY MENOR, J.

This is an appeal by the defendant who was convicted by a jury of the offense of promoting a dangerous drug in the second degree, under HRS § 712-1242(1)(c) (1976).

The principal issue on appeal is whether the trial court erred in denying the defendant's motion for production of James Scott, also known as Jimbo, [hereinafter "Jimbo"] or, in the alternative, for dismissal of the indictment. This motion was based on the allegation that the defendant was deprived of access to a material witness by reason of the government's connivance or participation.

Jimbo was a government informer who actively participated in the drug transaction involving the defendant. The defense in this case was entrapment, and Jimbo's testimony would have been material to that issue and might have been helpful to the defendant's cause.[1] *Roviaro v. United States*, 353 U.S. 53 (1957); *Velarde-Villarreal v. United States*, 354 F.2d 9 (9th Cir. 1965). The only prosecution witness to testify to the drug transaction out of which the charge against the defendant arose was Officer Morris DeRego. The officer testified that with Jimbo as his intermediary, he purchased heroin from the defendant. The defendant, however, denied that he sold the drug to the officer. He claimed that, while he was a witness to the heroin transaction, he himself was not a party to the sale. He said that he was playing pool in a bar with his friend Gregg when Jimbo approached the latter and asked him for some drugs. Jimbo wanted to buy one $50.00 "paper" of heroin for himself and another for an individual named Morris DeRego. Gregg did not trust Jimbo and wanted the money before giving him any drugs. Jimbo pleaded with Gregg and said that DeRego was waiting for him with the money.

---

[1] In *Roviaro*, the Supreme Court held that the government must disclose the identity of an undercover informer who had played a material part in bringing about the defendant's possession of the drugs, had been present with the defendant at the time of the alleged crime, and might have been a material witness as to whether the defendant knowingly possessed and transported the drugs as charged. After pointing out that the informer might have been the only witness, other than the accused, to prove entrapment or lack of guilty knowledge, the Court held that it was reversible error for the trial court to permit the government to withhold the identity of its undercover employee. In *Velarde-Villarreal*, the court pointed out that had the government informer been called, his testimony might possibly have served to corroborate the defendant's claim of entrapment.

Gregg was not convinced. Finally, Jimbo suggested that the defendant could go along to make certain that he was acting in good faith. When the defendant agreed to this arrangement, Gregg relented and turned the two packets of heroin over to Jimbo. At no time did the defendant have physical possession of the drugs. The defendant and Jimbo then walked out of the bar. DeRego was waiting further down the street. While the defendant sat and waited on a bench on the sidewalk, Jimbo went over to DeRego. After talking to him, Jimbo returned and delivered the money to the defendant. The defendant testified that he personally did not profit from the transaction. Asked why he became involved in the first place, he explained:

> Because Jimbo looked sick and he was just, kept sniffling to me like and to Gregg too that if he didn't do it, he was really bad off and I did it as a favor to Jimbo and to make sure also that Gregg didn't — Jimbo didn't steal from him.

In these circumstances, Jimbo was clearly a material witness and the defendant was entitled to his testimony on the issue of entrapment. *Roviaro v. United States, supra; Velarde-Villarreal v. United States, supra.*

The right of the accused to present matters in his defense is one of the fundamentals inherent in the due process guarantee of a fair trial. *State v. Horn,* 58 Haw. 252, 566 P.2d 1378 (1977). That guarantee necessarily includes the right to obtain the testimony of witnesses and to compel their attendance. *Washington v. Texas,* 388 U.S. 14 (1967). And while the government is not a guarantor of a defense witness' appearance at trial, *Villarde-Villarreal v. United States, supra,* and is under no duty to look for a defendant's witnesses, the government may not, by its own conduct, render a material witness unavailable to the defendant. *Id.; People v. Wilson,* 24 Ill.2d 425, 182 N.E.2d 203 (1962); *People v. Goliday,* 8 Cal.3d 771, 106 Cal. Rptr. 113, 505 P.2d 537 (1973). The question in this case, then, becomes whether the defendant was denied access to Jimbo through the actions of the government.

Prior to trial the defense had attempted to subpoena Jimbo but the serving officer was unable to locate him. The record shows that Officer Bernard Shigaki initially recruited Jimbo as a police informant. When Deputy Sheriff Arthur Asahara inquired as to Jimbo's whereabouts, however, Officer Shigaki's only response was that

he presumed that Jimbo was out of the State. At the hearing on the defendant's motion to produce witness, the government stipulated that on April 2, 1976, Jimbo was escorted to the Honolulu International Airport by members of the Honolulu Police Department. It also stipulated that the police had an agreement with Jimbo to dismiss pending charges against him in exchange for putting the police in contact with drug peddlers in the Waikiki area. Officer Morris DeRego, the undercover police participant in the drug transaction, was one of two officers who took Jimbo to the airport. He testified:

Q. Tell us what did you do from the moment that you arrived in the parking lot to the time that you and Jimbo departed.

A. We went inside, went up an escalator, he stood in line for a while. I believe he bought the ticket, I guess. I went up an escalator to say goodbye.

Q. Did you see the ticket?

A. No, sir. Oh, we also had a beer. He left.

Q. Who was "We had a beer?"

A. Me, Officer Sugimoto and Jimbo.

Q. Where did you bring Jimbo from?

A. He was picked up at King's Alley.

Q. What time?

A. I have no idea.

Q. Do you know what time you were at the airport?

A. No, sir. Afternoon.

Q. Do you know why Jimbo was at the airport?

A. I guess he was leaving.

Q. You weren't sure?

A. I was — I'm pretty sure, as a guess. I didn't see him get on any plane.

Q. What line did he stand in? Did he stand in a ticket line?

A. Yes, sir.

Q. Do you know where he was going?

A. No, sir. Didn't really care.

\* \* \* \*

Q. Did you see Jimbo board a plane?

A. No, sir.

Q. What point did you leave Jimbo?

A. After we took an escalator and some busses came. This is when I left him.

Q. Was it then that he went to the area where they had the jumbo jets; is that correct?

A. I guess.

\* \* \* \*

Q. Did you hear Detective Shigaki say that this ought to be enough money to send Jimbo off, or something to that effect?

A. Yes, sir.

Major Raymond Oliveira, Vice Division Chief, then testified:

Q. Do you know whether or not any deal was made between a police office — police department and Jimbo Scott that Jimbo would be permitted to leave this jurisdiction, if he assisted in various drug arrests? Are you aware of any such deal?

MR. TAKAYESU: Does this relate to other cases, your Honor.

THE COURT: I don't know. Mr. Lee?

MR. LEE: To other cases including Mr. Bullen's case.

THE COURT: I'm sorry. Can we have that question back again. Would you read it back.

THE COURT: I'll allow the question. It calls for either a yes or no.

THE WITNESS: Yes.

Q. BY MR. LEE: And what was the nature of that deal?

A. We, he — Scott was a — was a police informant. And after investigation was over, we went to the prosecutor's office to have some cases that he had pending nolle pross'd, and that upon disposition of all the cases, arrangements would be made for him to leave the jurisdiction.

Q. Arrangements by the Police Department?

A. That's correct.

Q. Did these arrangements including flying Jimbo Scott out of our jurisdiction?

A. Yes.

In these circumstances, we think that it was the conduct of the government which deprived the defendant of a possible material witness for his defense. While the trial court factually found that the police did not act deliberately and intentionally to place their in-

formant beyond the reach of the defendant, we do find that it was their almost cavalier attitude which later made it impossible for the defense to locate the police informer. When Officer Morris DeRego was asked if he knew where Jimbo was going after DeRego had taken him to the airport, the officer's answer was: "No, Sir. Didn't really care."

The Supreme Court has held that where the disclosure of an informer's identity "is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause," the government's privilege to withhold from disclosure the identity of persons reporting law violations to the police must give way to the due process requirements of a fair trial. *Roviaro v. United States, supra* at 60-61. Accordingly, where the informant has been an active participant in the crime charged, and his testimony might be helpful to the defense, fairness dictates that his identity be disclosed by the government.

Merely identifying the informer, however, would not suffice. Knowledge of the informant's name would be useless to the defendant unless he was also made aware of the location of the prospective witness. Where the government chooses to employ an informer in its sponsored enterprise, it must be prepared to supply the defendant with information as to his whereabouts. This would require the government, at the very least, to acquire information which might later be useful in locating the informant, while he is still under police discipline and control. Thus, in *People v. Goliday, supra,* the California supreme court concluded that "the defendant is denied a fair trial whenever the police fail to undertake reasonable efforts to obtain information useful for locating a material witness informer who served as an active agent of the police." 8 Cal.3d at 781, 106 Cal. Rptr. at 121, 505 P.2d at 545. In *Goliday* the court found that the police had deliberately failed to obtain the last names and addresses of two informants who had been eyewitness participants in a narcotics transaction out of which the charges against the defendant arose. They were therefore unable to provide that information upon the defendant's request. Because the government had failed in its duty both to obtain and to disclose information by which the eyewitness informants could be located, the court reversed the defendant's conviction for unlawful sale of drugs. The fact that the police might have been motivated by the desire to foster the security of their

informants, rather than by an intent to harm the defendant, was not considered by the court to be determinative. *See also Eleazer v. Superior Court of Los Angeles County,* 1 Cal.3d 847, 852, 83 Cal. Rptr. 586, 589, 464 P.2d 42, 45 (1970); *People v. Kiihoa,* 53 Cal.2d 748, 754, 3 Cal. Rptr. 1, 5, 349 P.2d 673, 677 (1960).

In the present case, it is abundantly clear that it was police conduct which made it impossible for the defendant to locate the police informant. Although we are satisfied that the police did not act deliberately and intentionally to render Jimbo unavailable to the defendant, the effect of their conduct was the same. At the very least, the police should have obtained as much information as possible which would have been useful in later locating him. They, however, "didn't really care" where he was going.[2]

We reverse and remand for new trial at which time the government must either produce Jimbo or risk dismissal of the indictment. *Villarde-Villarreal v. United States, supra.*

*Larry C. Y. Lee* and *Edmund K. U. Yee,* Deputy Public Defenders, on the briefs for defendant-appellant.

*Lee T. Nakamura,* Deputy Prosecuting Attorney, on the brief for plaintiff-appellee.

---

[2] Had the police, by reasonable diligence, kept themselves informed as to his whereabouts within this jurisdiction and had Jimbo then departed from the jurisdiction without police knowledge and participation, we would then be faced with an entirely different situation.