**Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000879
18-AUG-2021
07:47 AM
Dkt. 53 SO**

NO. CAAP-17-0000879

IN THE INTERMEDIATE COURT OF APPEALS
OF THE STATE OF HAWAI'I

STATE OF HAWAI'I,
Plaintiff-Appellee,
v.
SAMANTHA K.K. LABATAD,
Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CASE NO. 1CPC-17-0000610)

SUMMARY DISPOSITION ORDER
(By: Ginoza, Chief Judge, Leonard and Nakasone, JJ.)

Defendant-Appellant Samantha K.K. Labatad aka Samantha Labatad (**Labatad**) appeals from the Judgment of Conviction and Sentence, Notice of Entry (**Judgment**), entered on December 11, 2017, in the Circuit Court of the First Circuit (**Circuit Court**).[1] A jury found Labatad guilty of Assault in the Third Degree (**Assault Third**), in violation of Hawaii Revised Statutes (**HRS**) § 707-712(1)(a) (2014).[2] The Circuit Court sentenced Labatad to

---

[1] The Honorable Christine E. Kuriyama presided.

[2] HRS § 707-712 provides:

(1) A person commits the offense of assault in the third degree if the person:

(a) Intentionally, knowingly, or recklessly causes bodily injury to another person; or

(b) Negligently causes bodily injury to another person with a dangerous instrument.

(continued...)

one year probation and three days in jail, with credit for time served.

On appeal, Labatad contends: (1) the Circuit Court erred by omitting a mutual affray jury instruction; (2) the Circuit Court erred by denying Labatad's motion for mistrial based on prosecutorial misconduct; and (3) there was insufficient evidence to negate her claim of self-defense.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Labatad's points of error as follows, and vacate and remand based on instructional error.

The pertinent background is as follows. Plaintiff-Appellee State of Hawaiʻi's (**State**) May 15, 2017 Complaint against Labatad charged her with Assault Third against Donna Peake (**Peake**).[3] The subject incident occurred on the evening of November 1, 2016, at the conclusion of a movie showing at the Ward Theater in Kakaʻako.

Peake testified that she and her daughter, Courtney Choy (**Daughter**), entered the screening room around 6:00 p.m., taking seats a few rows from the back, with Peake sitting three to four seats from the right aisle, and Daughter to her left. Labatad and her boyfriend, Elijah Morris (**Morris**), then came, scooting past them and sitting two seats to their left. As the previews began, Labatad and Morris started to talk at a conversational volume, not whispering. Peake shushed them, but they continued to talk. Morris's phone rang a few times. Peake

---

[2](...continued)
        (2) Assault in the third degree is a misdemeanor unless committed in a fight or scuffle entered into by mutual consent, in which case it is a petty misdemeanor.

[3]        The Complaint stated:

        On or about November 1, 2016, in the City and County of Honolulu, State of Hawaiʻi, SAMANTHA K.K. LABATAD, also known as Samantha Labatad, did intentionally, knowingly, or recklessly cause bodily injury to Donna Peake, thereby committing the offense of Assault in the Third Degree, in violation of Section 707-712(1)(a) of the Hawaiʻi Revised Statutes.

shushed them again, for at least three times total, and Daughter also shushed them.  The couple did not react.

After the movie ended and credits began to roll, Peake, Daughter, Labatad and Morris stood up.  In the partially-lit theater, Peake approached the couple and said, "[Y]ou know, you guys, if you want to talk, talk outside.  You know, If [sic] you're here to watch the movie, watch the movie.  You know, in that, kind of auntie kind . . . ."  Morris reacted with a "humpf," but Labatad "went belligerent."  Peake testified that Labatad said, "[T]his is [sic] United States of America; I can do whatever I want."

Peake testified that at that moment, Morris was "right up against" Daughter's face.  He was taller, and Peake "feared for her" so she told Morris, "Don't you touch her."  Because Labatad was "in [Peake's] face" Peake told her, "Don't you touch me either; don't you touch any of us -- both of us."  Labatad responded:  "I can touch you if I want," and poked her three times on her collarbone, with her right hand.[4]  Labatad continued walking away, but "stepped back and said, Here, as a matter of fact, I'll give you this, 'woom.'"  Peake claimed Labatad hit her, with a closed fist, knocking her off balance.  Peake yelled at Daughter to call the police and screamed in the theater, "Get this girl, . . . she just punched me; she just assaulted me."

Peake testified that Morris was heading toward the exit with Labatad following him, when Labatad turned back and punched Peake again, in the lower right cheek.  Labatad and Morris pushed their way through the crowd and ran out the theater.  Peake and Daughter moved slowly into the lobby, where they talked to police, theater management, and ambulance personnel, and Peake gave a written statement to police.  Peake was given ice, but declined ambulance services, although her face was in "throbbing pain."  Peake testified she went to the emergency room the next morning around 10:30 a.m.  During the following week, Daughter

---

[4]     Daughter's testimony corroborates that Labatad poked her mother on the collarbone.

took photographs of Peake's face to show bruising on Peake's right cheek.

Daughter's testimony mostly corroborated the relevant details of Peake's story.  Daughter saw Labatad poke Peake and throw a drink at her.  Daughter said Peake asked her to call 911 after being poked, and while Daughter was on the phone Daughter heard Peake say Peake had been punched; Daughter did not see the hit but saw Peake "gripping her cheek" and saying she'd been punched.

Labatad and Morris admitted at trial they talked during the movie, despite knowing that they weren't supposed to.  Morris said after the movie, Peake and Daughter moved towards them and were preventing them from exiting the row, but not creating a barrier.  Peake "verbally confronted" them "along the lines of us being disruptive and how we shouldn't be, kind of scolding us." Morris continued to exit the row when Morris saw, out of the corner of his eye, "popcorn in the air and, like a -- a scuffle[,]" so he turned around and saw Peake and Labatad "yelling at each other."  Then he heard Peake saying, "[S]he hit me; she hit me."  Morris "grabbed" Labatad and said, "Let's go." They exited the theater.

Labatad testified that she was apologetic when Peake came over, but admitted saying it was a free country.  "She was looking at me frustratedly.  So . . . Yes; I'm sorry you feel that way; this is America; I do have a right to freedom of speech."  Labatad claimed she did not yell at Peake or move her body.  "I guess I did feel bad for disturbing her, because that's when I realized, like, the shushes were directed towards . . . me and [Morris], like, figuring out that I really was being inconsiderate.  So I did apologize to her."  Labatad stated that, "[I]t totally pissed [Peake] off. . . . [S]he made this really angry face at me, like she was going to do something."  Labatad explained that she and Morris had passed Peake, and Morris was passing in front of Daughter, "just trying to leave and avoid any problems . . . ."  Labatad said it was then that she got hit:  "I just felt, like, a really brute force, blunt strike to the back of my head, like somebody had hit me with their fist or their

elbow. It was a really forceful blow, and it, like, put me in shock." When cross-examined, Labatad could not pinpoint whether the impact was to her head. Labatad described her reactions as follows:

> I put my arms up -- both arms up like this . . . . [M]y body was, like, a -- in a cross . . . .
>
> . . . .
>
> With both my arms out super wide, I, like, 180 spinned [sic] around as fast as I could because the person, whoever it was, which I would assume it would be [Peake] -- I assumed that it wouldn't stop there because the physical violence has already started.

She spun around "with my arms out like this in attempt to push away and ward off . . . whoever hit me behind me." Labatad testified that after she had turned around, "I seen her [(Peake)] behind me, and I seen that I did strike her across her temple -- side temple and cheek of the face" with Labatad's right hand. Labatad said her hand was open, and she hit Peake with the back of her hand. Labatad rushed past Daughter, "because I've been struck and I've strucken [sic] [Peake] back." Peake followed her out into the aisle, yelling "assault." Labatad denied telling Peake she could touch her if she wanted or poking Peake. Labatad denied that she hit Peake a second time. Labatad claimed that when Peake followed her, Labatad threw the liquid contents of her cup at Peake. Morris then turned back toward Daughter and told her, "Control your mother." Labatad told the movie theater attendant as she left, "I defended myself; this is self-defense." Labatad did not file a police report.

On September 20, 2017, the day that voir dire was scheduled to begin, the prosecutor informed the Circuit Court that she had learned that Morris had five outstanding district court bench warrants, and that she informed defense counsel that the sheriffs might serve Morris that day, if he appeared to testify. Defense counsel expressed concern that the prosecutor notified the sheriffs about the warrants and stated: "I think we need to take steps to prevent it from somehow tainting this case or tainting this jury." Defense counsel requested that the

Circuit Court communicate concerns "through court staff with the sheriff's office . . . ." The Circuit Court indicated that it would do so, as follows:

> THE COURT: Okay. I agree with both of you. It's important that the trial proceed as scheduled without any negative impact from [Morris] appearing at court and testifying and/or being picked up on these outstanding District Court traffic warrants.
>
> I am willing to contact the sheriff's office. Again, I can only ask. They need to do the job they have to do, and I am not going to tell them otherwise. But I am going to request that if he does show up to court to testify today that he be allowed to come to -- into court and testify. What happens once he leaves the courtroom is something that is out of my hands. Again, I cannot interfere with their ability to do their job.
>
> I will do my best to ensure that nothing that happens is done in the presence of the jury. By that point, the jury will have been empaneled.

Later that day, the court clerk spoke with a deputy sheriff who wanted more information so the sheriff could track down the warrants to determine who, if anyone, would be trying to serve them. Defense counsel did not object to the warrant numbers being given to the sheriffs, but stated he was "in no way asking or endorsing that they take personal action to serve these warrants." The Circuit Court instructed the clerk to tell the deputy that the Court requested that Morris be allowed, "to testify without incident, and . . . to make sure that the jurors are not negatively impacted or tainted in any way." The Circuit Court stated, "I don't think it's appropriate for the Court to say, you know, 'don't serve the warrants' or 'serve the warrants.' That's entirely up to them."

The court clerk provided the sheriffs with the warrant information, along with Morris's date of birth. The judge, via speaker phone, "instructed the deputy sheriff that the Court's request was that [Morris] be allowed to testify today without incident and that the Court did not want the proceeding tainted or negatively impacted any -- in any way, shape, or form. And that would include the prospective jurors." The deputy asked if

the court staff would call once Morris had testified; the court refused.

Peake testified the next morning, on September 21, 2017. Some time before the lunch recess, the Circuit Court learned that Morris had been picked up on the outstanding warrants; and defense counsel expressed concern that he would not be available to testify.

Before reconvening after lunch, the Circuit Court heard testimony from two deputy sheriffs and Labatad's mother, regarding circumstances surrounding the service of the warrants on Morris. Deputy Sheriff Stephen Huynh (**Huynh**) told the Circuit Court that he and his partner, Deputy Sheriff Kimbrel Kim (**Kim**), arrested Morris on outstanding warrants at approximately 10:30 a.m., "five minutes, give or take." The sheriffs took Morris into custody in the witness room, approximately two rooms away from the courtroom. A woman, later identified as the defendant's mother, Tammie Labatad, was in the room with Morris. Someone leaving the courtroom would have to pass the witness room to exit the building. The deputies said they left the witness room door "slightly open."[5] Three other deputies were outside, along with other people whom Huynh believed were involved with another case because they sat on the benches further down the hall. The deputies handcuffed Morris behind his back, and without incident, escorted him down the hallway, downstairs and then took him to the Sheriff Receiving Booking Station in Kakaʻako.

Tammie Labatad testified that one sheriff was standing in the foyer, and another, identified as Kim sat, in plain clothes, next to her in the back of the courtroom. She was in the courtroom for five or ten minutes when both sheriffs "disappeared." She said she understood that the sheriffs were "supposed to take [Morris] after he testified." She said from the time she noticed the sheriffs were gone, and the time Morris had been taken from the courthouse, was 15 to 20 minutes.

Huyhn testified that the deputy prosecuting attorney notified him in person the day before to serve the warrants. The

---

[5] Tammie Labatad testified that the door was wide open.

7

prosecutor also requested a "standby" because "last time there was some disruptive -- or arguing going around -- going on with two females." Huyhn said the deputies chose the location to serve the warrants. Huyhn said they made an effort to make the arrest on the bench warrants outside the presence of the jurors, and "[a]s far as I know, they were -- I was understanding the jurors are all in here at the time of the arrest."

At the conclusion of the testimony regarding the service of the bench warrants, defense counsel moved for a mistrial, arguing that there was no conclusive evidence that the jury did not see the arrest. The defense alleged the "bigger problem" and basis for the mistrial was because the prosecutor took "affirmative steps" to have the warrants served, which intimidated Morris and constituted "an attempt to influence the outcome of this case . . . ."

The prosecutor disputed the allegation, asserting that she told the sheriffs that Morris "must be made available for trial; you can't just pluck him and hold him for the whole day." The prosecutor argued that when the arrest for the warrants occurred, the jury was in the courtroom listening to a witness, and there was no evidence that "their attention was elsewhere."

The Circuit Court noted that Morris had appeared on the first day of trial, September 20, 2017, knowing that he had outstanding warrants. The Circuit Court also observed that Morris appeared again that morning at 10:00 a.m., pursuant to the Court's order that he return to testify. After Morris was booked for the warrants, he again returned to the courthouse to testify.

Defense counsel interpreted the Circuit Court's instruction that Morris be allowed to testify as an order that Morris was "not to be touched until after he testified." (Emphasis added). The Circuit Court corrected him, however, clarifying that it was a request and not an order, and stating that: "it would be up to the sheriff's office or HPD to dispense with the warrants as they . . . were required to do." The Circuit Court found it was speculative to say whether Morris had been intimidated by the possibility of arrest. The Circuit Court also placed its own observations regarding the service of the

8

bench warrant on the record, as follows.  The judge noted she had a vantage point of the courtroom.  Deputy Kim was in plain clothes seated in the back of the courtroom, and the jurors could not see the other sheriff in the vestibule.  The Circuit Court found that Morris was taken into custody outside of the presence or hearing of the jurors, as the jurors were listening to cross-examination, the arrest was done without incident, and anyone in the hallway observing the arrest were not the jurors for this case.  The Circuit Court concluded that the trial had not been tainted and denied the motion for mistrial.

On September 22, 2017, before the jury was instructed and closing arguments, defense counsel informed the court that Labatad told him that there was "a potential interaction" during the break between Morris and two people believed to be relatives of Peake, asking him why he was arrested the previous day.  Defense counsel asked that the jurors be polled individually with the question he proposed:  "Have you heard of or were you made aware of anybody being arrested in the courthouse yesterday?"  This was done, and each juror answered in the negative.  Although defense counsel announced he was "satisfied regarding that issue[,]" he renewed the objection for mistrial based on "the related issue of the impropriety and the possible . . . tampering" based on the "fact and circumstances leading to the arrest itself."  The motion was again denied.

With regard to jury instructions, both the State and Labatad had submitted proposed jury instructions that included an instruction on Mutual Affray, taken from Hawaiʻi Standard Jury Instruction Criminal (**HAWJIC**) 9.21A, which reads:

> If you find that the prosecution has proven the offense of Assault in the Third Degree beyond a reasonable doubt, then you must also determine whether the prosecution has proven beyond a reasonable doubt that the fight or scuffle was not entered into by mutual consent.  This determination must be unanimous and is to be indicated by answering "Yes" or "No" on a special interrogatory which will be provided to you.

While settling jury instructions, both the State and Labatad withdrew their respective requests for the Mutual Affray instruction.  The jury was instructed on the elements of Assault

Third, without Mutual Affray, and self-defense.  The jury found Labatad guilty of Assault Third.  Labatad timely appealed.

### Mutual Affray Instruction

Labatad first contends the Circuit Court plainly erred by failing to instruct the jury on the mitigating defense of Mutual Affray.  Even though the proposed jury instruction was withdrawn by both defense counsel and the prosecutor, Labatad argues that there was evidence that Peake's injury was inflicted in a fight entered into by "mutual consent" when Peake confronted Labatad, hit her first from behind, and Labatad struck back in self-defense.  This contention has merit.

"When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading."  State v. Nichols, 111 Hawaiʻi 327, 334, 141 P.3d 974, 981 (2006) (quoting State v. Gonsalves, 108 Hawaiʻi 289, 292-93, 119 P.3d 597, 600-01 (2005)).  Because it is the duty of the trial court to properly instruct the jury, "once instructional error is demonstrated, [the court] will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, i.e., that the erroneous jury instruction was not harmless beyond a reasonable doubt."  Id. at 337, 141 P.3d at 984 (footnote omitted).

"Assault in the third degree is a misdemeanor unless committed in a fight or scuffle entered into by mutual consent, in which case it is a petty misdemeanor."  HRS § 707-712(2).  Mutual Affray "is not a lesser included offense of Assault in the Third Degree," but is a "mitigating defense that reduces the offense of Assault in the Third Degree to a petty misdemeanor."  State v. Kikuta, 125 Hawaiʻi 78, 95-96, 253 P.3d 639, 656-57 (2011) (citing HRS § 707-712(2)).  The Kikuta Court held that a trial court "must submit a mutual affray instruction to the jury where there is any evidence in the record that the injury was inflicted during the course of a fight or scuffle entered into by mutual consent, as indicated in HAWJIC 9.21."  Id. at 96, 253

10

P.3d at 657 (emphasis added). "[C]onsent" includes implied consent.  Id.  Consent may be "inferred from one's conduct" or may be "implied from an individual's words, gestures, or conduct."  Id. (citations, internal quotation marks omitted). The Kikuta Court determined from its review of the conflicting testimonies of the defendant and the complainant, that "there was some evidence adduced from which Complainant's consent to affray may be implied" and thus, the Mutual Affray instruction should have been given.  Id.

In this case, the record does not indicate why defense counsel and the prosecutor chose to withdraw their respective proposed Mutual Affray instructions.  However, their reasons are inconsequential given that where there is any evidentiary support for a defense, the Circuit Court *must* instruct the jury on it. Kikuta, 125 Hawaiʻi at 96, 253 P.3d at 657.  This is so even if the defendant explicitly waives such an instruction.  See State v. Adviento, 132 Hawaiʻi 123, 139, 319 P.3d 1131, 1147 (2014) (holding that a trial court must *sua sponte* instruct on the mitigating defense of extreme mental or emotional disturbance in a murder prosecution, where the defense was raised by the evidence, even though neither side requested such instruction).

Here, there was evidence in the record supporting Mutual Affray where Labatad testified that Peake confronted her, hit her on the back of the head, and "came after her[.]"  It is undisputed that Peake initiated the encounter by approaching Labatad and Morris to confront them for their talking during the movie.  Labatad's testimony that Peake hit her first, however, meets the threshold "any evidence" standard that Peake could have consented to a fight or scuffle, and thus, the Mutual Affray instruction was required.  Kikuta, 125 Hawaiʻi at 96, 253 P.3d at 657.

Without the Mutual Affray instruction and a special interrogatory about mutual affray,[6] the jury did not consider,

---

[6]     HAWJIC 9.21C, Assault Third by Mutual Affray Special Interrogatory:  HRS § 707-712(1)(a), provides as follows:  "Did the prosecution prove beyond a reasonable doubt that the fight or scuffle was not
(continued...)

once they determined Labatad was guilty of Assault Third, whether the parties may have mutually consented to engaging in a fight or scuffle.  "In a jury trial, the jury is the trier of fact and, thus, is the sole judge of the credibility of the witnesses and the weight of the evidence."  State v. Jhun, 83 Hawaiʻi 472, 483, 927 P.2d 1355, 1366 (1996) (citation omitted).  Given the conflicting evidence, there is "a reasonable possibility that the error" of omitting the Mutual Affray instruction and a special interrogatory on Mutual Affray contributed to the jury's guilty verdict on Assault Third as a misdemeanor, rather than as a petty misdemeanor.  Kikuta, 125 Hawaiʻi at 97, 253 P.3d at 658 (quoting Nichols, 111 Hawaiʻi at 337, 141 P.3d at 984); see State v. Henley, 136 Hawaiʻi 471, 479, 363 P.3d 319, 327 (2015) (holding that "we cannot say that the omission of the mutual affray instruction was harmless beyond a reasonable doubt, as it is possible, on this record, that given a choice between convicting Henley on misdemeanor Third Degree Assault and the mitigated offense of petty misdemeanor assault, the jury could have convicted Henley on the latter.").  Accordingly, we cannot conclude that the omission of the Mutual Affray instruction and special interrogatory about Mutual Affray was harmless beyond a reasonable doubt.  Thus, the Circuit Court plainly erred by failing to instruct the jury on the mitigating defense of Mutual Affray.

### Denial of motions for mistrial

Labatad contends that the Circuit Court "abused its discretion in denying the motion for mistrial where [the prosecutor] engaged in prosecutorial misconduct by causing the bench warrants to be served on [Morris] at court in violation of the de facto ruling of the court prohibiting such action."  Labatad argues the prosecutor breached her duty of candor to the Circuit Court by being evasive and vague about when and how the bench warrants would be issued when she "caused bench warrants to be served" during trial.  This contention is without merit.

---

[6](...continued)
entered into by mutual consent?  (Your answer to this question must be unanimous.)  Yes _____   No _____"

"The denial of a motion for mistrial is within the sound discretion of the trial court and will not be upset absent a clear abuse of discretion[,]" and the trial court "abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." State v. Lagat, 97 Hawaiʻi 492, 495, 40 P.3d 894, 897 (2002) (internal quotation marks and citations omitted).

In this case, the record reflects that there was no court order prohibiting the service of Morris's bench warrants during trial. Nor does the record reflect that there was a "de facto ruling" prohibiting the service of Morris's bench warrant during trial, as Labatad claims. The record indicates that the Circuit Court "made a request" to the sheriffs, that Morris be allowed to testify, and that "[a]fter he testified, it would be up to the sheriff's office or HPD to dispense with the warrants as they . . . were required to do." Much of defense counsel's argument below appears to be based on counsel's misimpression that the Circuit Court had issued an order prohibiting the warrants from being served until after Morris testified -- although the record shows no such order was issued. The Circuit Court corrected Labatad's counsel more than once about this mischaracterization of the court's action, clarifying that it had communicated a "request" to the sheriffs, and this "request" was not a court order.[7] Because the factual premise for Labatad's mistrial argument is not supported by the record, Labatad's contention is without merit.

In addition to the "de facto" ruling argument that we have rejected, Labatad also claims that "the basis for the

_____

[7] In its oral findings ruling on the mistrial, the Circuit Court stated, "I made the request. It was not a court order." Later, during the same hearing, in response to defense counsel again referring to the "request" as an order, the court again corrected him:

> [DEFENSE COUNSEL]: Well, I just wanted to make clear that I'm not trying to second-guess what the Court's orders were yesterday in terms of what was notified to the sheriffs.
>
> THE COURT: I'm sorry. It wasn't an order. It was a request.

mistrial alleged herein is [the prosecutor's] misconduct," due to her "willful violation of the court's de facto order and deliberate lack of candor" regarding her role in the service of the warrant. However, the Circuit Court did not make any findings regarding the prosecutor's conduct in the service of the bench warrants in this case; nor were there any findings regarding any "lack of candor" by the prosecutor. Labatad did not request the Circuit Court to make such findings below. Labatad's arguments on appeal also refer to "prosecutorial misconduct," but the record below shows that Labatad never argued or referenced the term "prosecutorial misconduct." Labatad generally alleged impropriety by the prosecutor, but did not specifically make the "prosecutorial misconduct" argument to the Circuit Court that she now raises on appeal. Thus, because "prosecutorial misconduct" was not raised below, the Circuit Court did not enter any findings or conclusions regarding prosecutorial misconduct. We conclude that the record is inadequate for appellate review of prosecutorial misconduct because these specific arguments were not raised below, and are waived. See State v. Moses, 102 Hawaiʻi 449, 456, 77 P.3d 940, 947 (2003) (legal issues and arguments not raised below are deemed waived on appeal).

Even if we were to consider Labatad's prosecutorial misconduct argument on its merits, the record here does not show that Labatad was denied her right to a fair trial where Morris testified, and Morris's arrest did not occur in the presence or hearing of any jurors. "Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." State v. Mara, 98 Hawaiʻi 1, 16, 41 P.3d 157, 172 (2002) (quoting State v. Clark, 83 Hawaiʻi 289, 304, 926 P.2d 194, 209 (1996)). Labatad argues that "dismissal in this case should be with prejudice" and reprosecution barred, under the standard set forth in State v. Rogan, 91 Hawaiʻi 405, 423, 984 P.2d 1231, 1249 (1999) where "the prosecutorial misconduct is so egregious that, from an objective standpoint, it clearly denied a defendant his or her right to a

14

fair trial."  While Labatad did not cite any authority on the issue of prosecutorial misconduct in the service of warrants during trial, the Hawaiʻi Supreme Court has stated that the government "may not, by its own conduct, render a material witness unavailable to the defendant."  State v. Bullen, 63 Haw. 27, 29, 620 P.2d 728, 730 (1980) (citing Washington v. Texas, 388 U.S. 14 (1967) (other citations omitted).[8]  In this case, however, there are no factual findings establishing what the State's conduct was in facilitating the service of the bench warrants on Morris.  The record here is insufficient to review whether there was any prosecutorial misconduct that was "so egregious" under Rogan, 91 Hawaiʻi at 423, 984 P.2d at 1249, to warrant a dismissal with prejudice.  Ultimately, Morris was not rendered unavailable to Labatad's defense, because Morris returned to the courthouse after the bench warrants were served, and was able to testify.  Cf. Bullen, 63 Haw. at 29, 640 P.2d at 730.

Under the specific circumstances of this case, we conclude that the Circuit Court did not abuse its discretion in determining a mistrial was not warranted, where the defendant's ability to call the witness was not compromised.[9]  In its oral ruling denying the motion for mistrial, the Circuit Court found that Morris was taken into custody outside of the presence or hearing of the jurors, the jurors were listening to cross-examination at the time, the arrest was done without incident, and anyone in the hallway who saw the arrest were not the jurors

---

[8]     In Bullen, the Hawaiʻi Supreme Court held that where the conduct of the government rendered a government informant who was a material witness for the defendant unavailable, the government was required to produce the witness or risk dismissal of the indictment.  63 Haw. at 29, 620 P.3d at 730.

[9]     In affirming the denial of the mistrial in this case, however, we do not necessarily condone what occurred, *i.e.*, the service of a bench warrant in the courthouse on a defense witness during a jury trial, that the prosecution and the Circuit Court knew was likely to be executed during trial, possibly in the courthouse.  A court may want to consider an order prohibiting any service of bench warrants of witnesses during trial in the courthouse, to prevent disruption of a trial from occurring in the first instance and eliminate the potential of a mistrial.  Such a court order could be considered pursuant to the circuit court's powers under HRS § 603-21.9(6) (2016) to issue orders or "take such other steps as may be necessary . . . for the promotion of justice in matters pending before them."

in this case. The Circuit Court denied the motion for mistrial stating:

> I don't think we can speculate about whether or not Mr. Morris was intimated [sic] by what was happening because he knew about the outstanding warrants yesterday, yet he showed up to court. He returned to court today, as ordered by the Court. At your request, we -- I did order him to be here at 10:00 A.M. The warrants have been taken care of, and he is back at court. So I am unable, on the record and in light of the credible and reliable evidence, to make a finding that the process has been tainted in any way.

Morris testified as a defense witness. Labatad does not challenge the Circuit Court's oral findings on appeal. On this record, we cannot say that Labatad's right to a fair trial was violated, and the Circuit Court did not abuse its discretion in denying the motion for mistrial. See Lagat, 97 Hawaiʻi at 495, 40 P.3d at 897.

### Self-Defense

In her final point of error, Labatad contends that the State produced insufficient evidence to rebut her proof of self-defense. This contention is without merit.

"[O]nce the issue of self-protection is raised, the burden is on the prosecution to disprove the facts that have been introduced or to prove facts negativing the defense and to do so beyond a reasonable doubt." State v. Lubong, 77 Hawaiʻi 429, 431, 886 P.2d 766, 768 (App. 1994) (citations omitted). When reviewing the sufficiency of evidence on appeal, "evidence adduced in the trial court must be considered in the strongest light for the prosecution . . . ." State v. Kalaola, 124 Hawaiʻi 43, 56, 237 P.3d 1109, 1122 (2010) (citations omitted). "The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact." Id. (citations and italics omitted). Substantial evidence is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Id. at 49, 237 P.3d at 1115 (citations omitted).

Here, the only evidence establishing that Peake used force against Labatad first, was Labatad's own testimony. Peake

testified that Labatad punched her "with all her might" after poking her in the collarbone.  Daughter saw Labatad poke Peake and shortly after saw Peake holding her cheek, saying she had been punched.  The jury's verdict entailed credibility determinations, where Labatad and Peake gave opposing accounts of who hit whom first.  The credibility of witnesses and the weight of the evidence is the province of the factfinder -- here, the jury.  See Jhun, 83 Hawaiʻi at 483, 927 P.2d at 1366.  Testimony from Peake and Daughter constituted sufficient, credible evidence to enable a person of reasonable caution to reject Labatad's self-defense claim.  See Kalaola, 124 Hawaiʻi at 49, 237 P.3d at 1115.

Therefore, IT IS HEREBY ORDERED that the Judgment of Conviction and Sentence, Notice of Entry, entered on December 11, 2017, by the Circuit Court of the First Circuit, is vacated and remanded for a new trial consistent with this Summary Disposition Order.

DATED:  Honolulu, Hawaiʻi, August 18, 2021.


On the briefs:                      /s/ Lisa M. Ginoza
                                    Chief Judge
Alen M. Kaneshiro,
Attorney at Law                     /s/ Katherine G. Leonard
for Defendant-Appellant             Associate Judge

Donn Fudo                           /s/ Karen T. Nakasone
Deputy Prosecuting Attorney         Associate Judge
for Plaintiff-Appellee